# SAGE *v.* MEMPHIS AND LITTLE ROCK RAIL-ROAD COMPANY.

# MEMPHIS AND LITTLE ROCK RAILROAD COMPANY *v.* SAGE.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

Nos. 126, 127. Argued January 6, 9, 1888. — Decided March 19, 1888.

Whether a receiver of the property of a railroad company shall be appointed by a court of equity, is a matter within the discretion of the court, and this discretion is to be exercised sparingly, and with great caution, and with reference to the special circumstances of each case as it arises.

A bill in equity, brought by a judgment creditor of a railroad company against the company, which alleges in substance that the property of the company is so heavily mortgaged that if the plaintiff should attempt to enforce payment of his debt by seizure and sale on execution there would

be no bidders at more than a nominal amount, while, if the property were placed in the hands of a receiver by the court, and held together and carefully used in transporting passengers and freight, there would be a large surplus each year for the payment of the plaintiff's debt, contains ample averments to give a court of equity jurisdiction to appoint a receiver of the property : but this point is decided on the facts of the present case, and the court does not mean to say that one or more of the judgment creditors of a railroad company can, as matter of right, require such a property to be put in the hands of a receiver merely because the company fails or refuses to pay its debts.

The fact that a judgment creditor filing a bill in equity to obtain the appointment of a receiver of the debtor's property did not first sue out execution and have a return of *nulla bona* is immaterial, if not objected to by the debtor, and if it appears on the admitted facts that so doing would have been an idle ceremony.

If a court of equity is induced by imposition to appoint a receiver of the property of a railroad company when one would not have been appointed had the court been aware of the exact situation, and the receiver is discharged on learning the imposition, and during the receivership a fund has accumulated from surplus earnings, trustees, representing mortgage creditors of the corporation, who did not intervene in the suit pending the receivership and set up no claim to the fund during the receivership and had no claim to it except as mortgage trustees out of possession, are not entitled to the fund.

It is again held that the mortgagor of a railroad is not required to account to the mortgagee for earnings, even though the mortgage covers income, while the mortgaged property remains in the mortgagor's possession, and no demand has been made for it or for surrender of its possession under the provisions of the mortgage.

Mortgage bondholders of a railroad company who obtain judgment on their bonds or coupons and intervene individually and without the appearance of their trustees in a suit brought by a judgment creditor of the company whose debt is not secured by the mortgage, in which a receiver has been appointed, do not thereby deprive the plaintiff creditor of his priority of right in the accumulating income from the property in the hands of the receiver.

THE case was stated by the court as follows:

The decree from which these appeals are taken relates to the distribution of a fund in the registry of the Circuit Court arising from the operation, by its receiver, of the Memphis and Little Rock Railroad Company (as reorganized). The decree directed it to be paid to the surviving trustees in a certain mortgage executed by that company, for distribution

among the beneficiaries under said mortgage. Sage and the railroad company each complain of that decree; the former insisting that the money should have been applied in satisfaction of a judgment obtained by him against the company, while the latter insisted that it was entitled to receive it.

The history of the claims of the respective parties is as follows:

On the 24th day of June, 1882, the Memphis and Little Rock Railroad Company (as reorganized) in an action brought by Russell Sage, on that day, in the Circuit Court of the United States for the Eastern District of Arkansas, confessed judgment in his favor for the sum of one hundred and twenty-five thousand nine hundred and twenty-one dollars and thirteen cents, that sum being the aggregate amount, principal, and interest, of a demand note for $115,479.03 executed by that company, June 20, 1882, to the president of the Missouri Pacific Railway Company, and indorsed by him to Sage, and of another note of $10,000 held by the latter against the same defendant.

On the same day on which this judgment was entered, Sage commenced in the Chancery Court of Pulaski County, Arkansas, a suit in equity against the Memphis and Little Rock Railroad Company (as reorganized). The bill, after setting out the judgment, alleged that the entire tangible property of the company consisted of its railroad — extending from its junction with the St. Louis, Iron Mountain, and Southern Railroad, through the counties of Pulaski, Lonoke, Prairie, Monroe, St. Francis, and Crittenden to the Mississippi River — an inclined track used to transfer its rolling-stock across that river to Memphis, a steamboat, certain lands and depot in that city, locomotives, cars, and other property, such as are usually employed in the management of a railroad; that the defendant by deed of May 1, 1877, duly recorded, mortgaged its property to trustees to secure the payment of bonds, amounting to $250,000, and maturing in instalments of $50,000 each, on the first day of May in the years 1879 to 1883, inclusive, of which instalments four were then due and unpaid; that by deed of May 2, 1877, duly recorded, defend-

ant mortgaged its property, rights, and franchises of every description to secure the payment of other bonds with coupons attached, amounting to $2,600,000, payable July 1, 1907, and bearing interest, after July 1, 1882, at the rate of eight per cent per annum; that both of said mortgages authorized the trustees to take possession of and sell the mortgaged property upon the non-payment of any of the bonds or interest at maturity; that the aggregate amount of the mortgages exceeded the salable value of the property and franchises of every description owned by the company, or, at least, the sum for which they would sell under execution; that by reason of the existence of the mortgages no bidders could be found at more than nominal amounts for the property; that a large part of the bonds secured by the mortgages being due and unpaid, the trustees would interfere with the sale of any part of the property under execution if the plaintiff should attempt, in that mode, to enforce payment of this judgment; and that for these reasons the suing out of execution upon such judgment would cause useless expense and delay, and result in no benefit whatever to plaintiff.

The plaintiff also alleged that if the company's property was held together, and carefully used in the transportation of passengers and freight, it would produce a large income, sufficient to pay all operating expenses and necessary repairs, leaving each year a large surplus to pay off and discharge plaintiff's debt; that such income could be made only by working the property as a unit, for purposes of transportation; consequently, the seizure and sale of it, or of any material part thereof, would destroy its capacity to produce such income, without benefit to the plaintiff, and at the same time incommode the public by destroying the use of the road in the manner contemplated by the State.

The bill further alleged that the company had hitherto failed and refused to apply its surplus income to the payment of its debts, and unless prevented would continue in that course, and apply its surplus to other uses to his great injury and loss.

The relief asked was that the court take possession of and

operate the road, by a receiver, and, in that manner, seize upon the only means in reach of the law for satisfying the plaintiff's demands; such relief to be subject to all the rights and equities of the holders of bonds or of said trustees.

The railroad company appeared and waived notice, and the court being of opinion that the relief asked was necessary, for the protection of the plaintiff's interests and rights, E. K. Sibley was appointed receiver. He was directed to take possession of the entire railroad, with the inclines, connections, tracks, depots, rolling-stock, books, papers, and all other property of the company of every kind. The company was ordered to surrender possession and the receiver directed to operate the railroad, in the usual manner, in the carriage of passengers, freights, and express matter, keeping account of all receipts and expenses, and, making report of all his acts and doings, as might be required. Such surrender was made, and possession was taken by the receiver.

John L. Farwell and Robert K. Dow, as stockholders of the company, respectively intervened, October 14, 1882, and November 1, 1882, as defendants, and assailed the proceeding in which the receiver was appointed as being merely a financial expedient, by which Sage and others could make a successful speculation in the stocks and securities of the company. They charged that the company was not really indebted to Sage in any sum, and, among other things, they asked that he be enjoined from prosecuting his judgment, and that the receiver be discharged. On the 10th of November, 1882, they filed their respective petitions for the removal of the cause to the Circuit Court of the United States, and it was so removed.

On the 1st of December, 1883, Dow and many others, holding judgments rendered by default upon preferred mortgage and general mortgage coupons, filed their claims. These judgments aggregated nearly $200,000. Two days thereafter, December 3, 1883, an order was entered requiring the receiver at once to surrender *to the railroad company* all the property of whatever kind in his custody as receiver; to pay out of the money in his hands all sums and dues authorized by the order appointing him; to retain the balance subject to

the order of the court; and to make full report of his acts, showing what moneys he had received and for what purpose they had been expended. The order declared that the railroad and other property in the hands of the receiver were delivered to the defendant only upon the condition — to which it assented — that it assume all the liabilities of the receiver and agree to pay and discharge, out of the property or its income, all demands which might be legally established by judgment against the receiver; in default whereof the court might retake possession, and, by proper order, enforce the payment of such judgments.

On the 12th day of February, 1884, the receiver filed a report of his administration of the property, from which it appeared that there were a few unsettled accounts for traffic balances due to and from him, which he was unable to adjust. The company assuming in open court to pay such balances as were due from the receiver, it was, by consent of the parties, ordered that the receiver transfer to it all balances due to him, and that it receive and retain them for its own use. Thereupon the complainant filed a petition praying that the receiver, out of the funds in his hands, pay his judgment in the bill mentioned. The defendant filed a motion to strike from the files sundry claims of H. Sanford and other creditors of the defendant, and that the money in the hands of the receiver, after paying the amount due the complainant, be paid to the defendant and to certain-named creditors.

Upon the hearing, February 14, 1884, of the motion to strike out the claims of H. Sanford and others, said creditors respectively amended their claims by adding the following: "Claimant says that the bill filed in this suit, and all the subsequent proceedings therein, have been simulated, collusive, and fraudulent, and intended to cheat, hinder, and delay this claimant, and others in like cases, in the collection of their just debts, one of which is evidenced by said judgment in favor of claimant; wherefore he prays that his said claim be paid out of said fund in preference to all unsecured debts against said defendant." The court, thereupon, overruled the motion to strike out the claims of Sanford and others.

The cause was then referred to the master to report upon the charges of fraud and collusion made in the amended claims. By subsequent order, the master was directed to show by his report the total amount of money which came to the hands of the receiver; the amount expended by him in new construction and improvement of the road; the operating expenses of the road while in his hands; the amount paid out by him in costs and attorneys' fees in this suit, to whom paid, and for what services; and the total amount of money with which the receiver should be charged in a final settlement of his accounts.

On the 23d of February, 1884, Dow and Matthews, trustees in the mortgage of May 1, 1877, filed their claim and petition of intervention, they having previously brought suit to foreclose. In that petition they prayed that the moneys in the hands of the receiver be applied in discharge of the bonds secured by such mortgage. April 15, 1884, Dow, Matthews, and Moran, trustees in the mortgage of May 2, 1877, (the latter being successor of Pierson,) filed their claim of intervention praying that if the fund in court was not paid out on the claim and intervention theretofore filed by Dow and Matthews, it be paid in discharge of overdue interest on the bonds secured by the latter mortgage.

On the 22d of May, 1884, the master made a report embodying among others the following findings: 1. That the total amount which came to the hands of the receiver during his term of office, was $1,675,919.73; 2. That the amount expended, during his administration, for new construction, was $310,992.92, not including certain sums expended for bridge repairs, cross-ties, repairs to locomotives, and maintenance of cars; 3. That the amount chargeable to the receiver on final settlement of his accounts was $218,998.98, which he had deposited as required by the court, and that he was thereby fully acquitted; 4. That the suit instituted by Sage was collusive in that it was brought with the connivance of the railroad company, for the purpose of shielding it by means of a receivership, against suits by the company's creditors; 5. That during the receivership, the railroad was largely improved by

Argument for Trustee.

.the receiver out of the income of the property, and that the receiver was honest, competent, and faithful; 6. That Dow, one of the trustees in both the preference and general mortgages of the company, was the managing trustee, having or seeming to have the chief direction of all litigation involving either the trustees or the holders of bonds secured by the general mortgage; 7. That the intervenors were holders of bonds secured by the general mortgage, and that at no time during the continuance of the receivership did the trustees, as trustees of either mortgage, seek to intervene in the cause, or to take any action in regard to the property, or to cause its restoration to the defendant company, or to take any steps to put an end to the receivership; 8. That before the failure of the company to pay any instalment of interest, Dow stated and threatened that in case any default in the payment of such interest occurred, the bondholders would not take any steps to foreclose the mortgage, but, would bring as many separate suits at law in the United States Circuit Court as could be separately brought upon coupons taken from the bonds secured by the mortgages every six months.

Exceptions by Sage and the company to the master's report having been overruled, it was adjudged that the money in the registry of the court be paid to Robert K. Dow and Watson Matthews, surviving trustees in what is called the preference mortgage of May 1, 1877, for distribution by them among the beneficiaries under that mortgage, and that plaintiff pay all the costs of this suit. From that decree Sage and the railroad company have separately appealed. No appeal was prosecuted by bondholders having judgments at law, and who, by the decree, were placed upon an equality with other bondholders secured by the same mortgage, who had not obtained judgments for the amount of their unpaid coupons.

*Mr. Wager Swayne* for Sage, and for the Memphis and Little Rock Railroad Company as against intervening trustees and judgment creditors.

*Mr. U. M. Rose* for the trustee.

We are not concerned with the question as to whether the railroad company could have claimed the money accumulated by the receiver; for the company did not claim it. Of course it was contended in the court below that the railroad company had unlimited control over the fund; and reference was made to *Gilman* v. *Illinois Tel. Co.,* 91 U. S. 603, 607; *Galveston Railroad* v. *Cowdrey,* 11 Wall. 459, 483, and *American Bridge Company* v. *Heidelbach,* 94 U. S., 798, where it is declared in effect that where a mortgage executed by a railroad company grants its income, with privilege to the mortgagor to use its income until possession is taken by the trustees named in the mortgage, in operating the road, the trustees cannot claim any part of the income accruing before they take, or at least demand possession.

Those cases were, however, in no wise like that at bar; they were cases where there were contests between the trustees and *bona fide* creditors of the mortgagor. We have then all the difference between an honest creditor and a fraudulent claimant who has trumped up a spurious claim for the purpose of cheating, hindering, and delaying honest creditors. The methods that the law has devised for the protection of the one can hardly be invoked for the accomplishment of the ends of the other.

It is a requirement of public policy that parties dealing with the corporation, or injured by it, shall have the right not only to sue the party with which they deal, or which has injured them in the prosecution of its business, but also to secure themselves upon any moneys or chattels, the proceeds of that dealing and business, by means of the remedies provided for in like cases between natural persons. *Smith* v. *Eastern Railroad,* 124 Mass. 157. This rule is established for the advantage of meritorious creditors; and can have no application for the purpose of propping up a scheme devised for their overthrow.

In *Gilman* v. *Illinois Tel. Co.,* it is conceded that any money derived from operating the road after the appointment of a receiver could go to the trustees. The court say: "It is clearly implied in these mortgages that the railroad company

should hold possession and receive the earnings until the mortgagees should take possession, *or the proper judicial authority should interpose.*" In this case judicial authority did interpose. Pending the receivership the fund accumulated in court after all the operating expenses of the road were paid. By the terms of the mortgage the mortgagor is estopped from claiming this money, which is dedicated to the payment of its bonds.

While the receiver was in possession the trustees could not take the property into their custody so as to appropriate its income; and certainly the bondholders should not suffer a loss because by collusion with another the mortgagor has prevented the bondholders and trustees from securing the same fund in another and a legitimate manner.

By the terms of the mortgages the trustees could only enter into possession on the written request of a majority of the bondholders in value; a troublesome process requiring time for its execution.' In the meantime the debtor was accumulating a fund, not to be used for the legitimate purpose of operating the road, but in payment of the spurious demand of a fraudulent accomplice. Certainly a case of this kind requires a separate treatment; for if the fund is to be paid over to the fraudulent parties, the court must not only condone the fraud, but must pay a reward for its commission.

Where under a mortgage like that now before the court the question as to the right to the surplus income is between the mortgagor and the mortgagee alone, the surplus must be awarded to the latter, because such is their contract, and any other disposition of the fund would be an act of bad faith. *Pullan* v. *Cincinnati and Chicago Railroad Co.*, 5 Bissell, 237.

But apart from the clause in the mortgage pledging the income and money of the company to the trustees, the money was properly decreed to them; for, by reason of the trust relationship between the parties and the admitted insolvency of the company, a court of chancery had jurisdiction to apply the fund to the payment of the bonds whose holders were represented by the trustees, though no judgments at law had been recovered on them. *Case* v. *Beauregard*, 101 U. S. 688.

In that simple aspect of the case the suit would be one for equitable garnishment. *King* v. *Payan*, 18 Arkansas, 583. As between the claims represented by the trustees and the simulated demand of Sage a court of chancery could not hesitate.

The suit seemed to be based on a contention that when a corporation gets in debt beyond its present means of payment, it may fly to a court of chancery as to a house of refuge; and may ask its assistance to keep its creditors at bay. The object of the plaintiff and defendant in this suit being to keep the property of the latter in the hands of a receiver indefinitely, during which time there should be no officer of the defendant upon whom legal process could be served, the whole proceeding was stamped with the grossest fraud. As was said in *Drury* v. *Cross*, 7 Wall. 299, 303: "If the law permits the debtor in failing circumstances to make choice of the persons he will pay, it denies him the right in doing it to contrive that the unpreferred creditor shall never be paid. In other words, the law condemns any plan in the disposition of property which necessarily accomplishes a fraudulent result."

It has often been remarked that the statutes against fraudulent conveyances are merely declaratory of the common law, which unaided would have worked out the same results. But the statute in Arkansas is amply broad enough to cover the device to which recourse was had in this case. That statute declares that "every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods and chattels, or things in action, or of any rents issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, *suit*, judgment, decree, or execution, made or contrived with the intent to hinder, delay or defraud creditors or other persons of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void." Mansfield's Digest, 1884, § 3374.

"Every attempt by a debtor to violate or evade the law, so as to delay his creditors in the collection of their debts, to the hindrance of the due course and execution of the law, is unquestionably fraudulent and void as against such creditors."

*Kimball* v. *Thompson*, 4 Cushing, 441, 447; *S. C.* 50 Am. Dec. 799.

If Sage could expect to participate in a fund raised through the fraudulent device contrived by him and the defendant, the statute would necessarily be violated; for, instead of his scheme being "void," it would be thoroughly effectual; and the guilty party, by virtue of a decree in chancery, would carry off the spoils. The law would not only be annulled, but the courts, by assisting in the success of the unlawful device, would render themselves accessory to the fraud. A contention that so far violates fundamental principles cannot be sustained. *Bean* v. *Smith*, 2 Mason, 252; *Smith* v. *Craft*, 11 Bissell, 340; *Wilson* v. *Horr*, 15 Iowa, 489, 493.

In Arkansas there is a statute against fraudulent conveyances: "Every person who shall be a party to any conveyance or assignment of any real estate, or interest in any real estate, goods or chose in action, or any rents or profits issuing therefrom, or to any charge upon such estate, with intent to defraud any prior or subsequent purchaser, or to hinder, delay, or defraud creditors or other persons, shall be deemed guilty of a misdemeanor, and on conviction shall be fined in any sum not less than $500." Mansfield's Digest, 1884, § 1649.

If Sage had a judgment at law, yet in the eyes of a court of chancery, by the light shed on the transaction by the testimony in this case, that judgment is no judgment. If he has a debt against defendant, it is simply a debt evinced by the contract. *Hill* v. *Elliott*, 12 Mass. 31; *Harris* v. *Sumner*, 2 Pick. 137; *Riggs* v. *Murray*, 2 Johns. Ch. 565; *Beach* v. *Viles*, 2 Pet. 675, 678.

It is not necessary to dwell on these cases, as they have no application to the case where a corrupt motive is charged and proved. Where a deed is executed in contravention of some principle of law, but without any fraudulent intent, the courts may hold that the grantee is not to be punished for mere inadvertence; but where a well-defined intent to defraud others is manifest, the courts cannot confer any benefit on a party to the fraud without making themselves a party to the fraudulent device. If they should do so, they would with one

breath condemn the transaction and enforce its execution. In a case of a deed that is constructively fraudulent the convey-ance is simply void; and the creditor stands with regard to his debt just as if the deed had not been executed; but in this case, fraud entered into the inception of the transaction and gave color to it from beginning to end.

The creation of the supposed debt on which the judgment was based was a part of one indivisible scheme to defraud and injure others. Such a claim cannot be allowed to enter into competition with the claims of creditors that are without sus-picion; and certainly we can find no case where a creditor has ever been guilty of actual fraud in a proceeding by means of which a fund has been raised, where he has been allowed to participate in the fund.

This case is, however, far worse than any that has ever come before the courts; for it is apparent that the defendant did not owe Sage anything; and that behind the scenes the whole pretence of a debt due to him was, as the master reported " a juggle" between the defendant and the Missouri Pacific Rail-way Company, which owned substantially all the stock of the defendant company, the sole object and purpose being to cheat, hinder and delay the creditors of the latter.

The bondholders being very numerous, the trustees properly represented them in the court below. *Kerrison* v. *Stewart,* 93 U. S. 155; *Carey* v. *Brown,* 92 U. S. 171; *Boyd* v. *Jones,* 44 Arkansas, 316.

"The trustee of a railroad mortgage represents the bond-holders in all legal proceedings carried on by him affecting his trust to which they are not actual parties; and whatever binds him, if he acts in good faith, binds them." *Shaw* v. *Railroad Co.,* 100 U. S. 605, 611.

Finally, we are unable to perceive on what theory Sage's appeal is prosecuted. In his bill he only prayed the relief sought " subject to all the rights and equities of the holders of said bonds, or of their trustees." He cannot therefore com-plain of a decree establishing the superior claim of the trustees. *Water Works Co.* v. *Barret,* 103 U. S. 516; *Pacific Railroad* v. *Ketchum,* 101 U. S. 289; *United States* v. *Babbitt,* 104 U. S. 767.

We submit that if there had been no clause in the mortgage as to money and income, the trustees might have claimed the fund simply by this proceeding as an equitable garnishment. They had a duty to perform for the protection of the numerous bondholders scattered throughout the world. The company admitted its insolvency. There was a fund in court unappropriated, which could only be reached by an intervention. The right of the trustees to intervene was clear. *Day* v. *Washburn*, 24 How. 352; *Wiswall* v. *Sampson*, 14 How. 52, 66; *American Bridge Co.* v. *Heidelbach, ubi supra; Williams* v. *Gibbes*, 17 How. 238, 256; *Ex parte Boyd*, 105 U. S. 647, 652; *In re Howard*, 9 Wall. 175; *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459.

The New York statute referred to in *Ex parte Boyd* has been enacted in Arkansas. Mansfield's Digest, 1884, § 3084.

Prior to the beginning of the equitable proceeding that act requires the issue of a writ of execution, and a return of "no property found." That part of the act was repealed by an act approved March 31, 1887, which enacts "that in suits to set aside fraudulent conveyances and to obtain equitable garnishments, it shall not be necessary for the plaintiff to obtain judgment at law in order to prove insolvency; but in such cases insolvency may be proved by any competent testimony, so that only one suit shall be necessary in order to obtain the proper relief." Statutes of Arkansas, 1887, p. 193.

This act is substantially similar to one enacted in West Virginia, and lately acted on by this court in *West Fairmont Gas Coal Co.* v. *Dewey*, 123 U. S. 329.

The property of the railroad company could not be sold under execution by judgment creditors whose judgments were based on coupons secured by the mortgages. *Tice* v. *Annin*, 2 Johns. Ch. 125, 130.

Nor can the property of a railroad company be sold under execution. *Gue* v. *Tide Water Canal Co.*, 24 How. 257; *Railroad Co.* v. *James*, 6 Wall. 750; *Jackson* v. *Ludeling*, 21 Wall. 616, 623.

Where an execution can accomplish nothing its issue is not a prerequisite to the filing of a creditor's bill. *Wright* v. *Campbell*, 27 Arkansas. 641.

Besides, the admission of Sage that the property mortgaged would not suffice to pay the mortgage debt showed that the issue of an execution would have been unavailing. *Lex neminem cogit ad vana seu inutilia.* Moreover, as was said by Chief Justice Marshall, " it is also true that if a claim is to be satisfied out of a fund which is accessible only by the aid of a court of chancery, application may be made in the first instance to that court, which will not require that the claim be first established in a court of law."

[The counsel also argued that the Railroad Company was **not** entitled to the fund, as against the Trustees.]

Mr. Justice Harlan, after stating the facts in the above language, delivered the opinion of the court.

We do not understand upon what principle the court below held that the trustees in the mortgage of May 1, 1877, were entitled, as against both the mortgagor company and Sage, to claim the net earnings of the road during the receivership. The latter was a judgment creditor of the company, and it was at his instance, in a suit commenced by him, that its property was put in the hands of a receiver. This was done because in the opinion of the court the appointment of a receiver was necessary "to protect plaintiff's interests and rights." If the grounds set forth in the bill were not sufficient to justify the appointment of a receiver, they were ample to give a court of equity jurisdiction to do so. In *Union Trust Co.* v. *Illinois Midland Co.*, 117 U. S. 434, 458, the court said : " The co-plaintiffs with Hervey were judgment creditors of the Paris and Decatur Company, with executions returned unsatisfied. The bill set out the precarious condition of all the property held and used by the Illinois Midland Company, and the necessity for a receiver, in the interest of all the creditors of all four of the corporations, to prevent the levy of executions on such property ; and it prayed for a judicial ascertainment and marshalling of all the debts of all the corporations and their payment and adjustment as the respective rights and interests of the creditors might appear, and for

general relief. The plaintiffs set forth that they represented a majority of the stock in all the corporations. This bill was quite sufficient to enable a court of equity to administer the property and marshal the debts, including those due the mortgage bondholders, making proper parties before adjudging the merits."

In the present case, it is true, Sage did not sue out execution upon his judgment and have a return of *nulla bona*. But that point has become immaterial. The railroad company made no such objection at the time the receiver was appointed. Besides, suing out an execution would, according to the facts and the admission of the parties, have been an idle ceremony, causing useless expense, and bringing no real benefit to the plaintiff. It is true, also, that Sage did not sue in behalf of all the creditors of the company or of such as might come in and contribute to the expense of the litigation. He was not bound to pursue that course. It was his privilege, under the law, to sue for his own benefit, and it was within the power of the court, for his protection as a judgment creditor, to place the property of the debtor company in the hands of a receiver, for administration under its orders. We do not mean to say that a single judgment creditor or any number of such creditors of a railroad company are entitled, as matter of right, to have its property put in the hands of a receiver, merely because of its failure or refusal to pay its debts. Whether a receiver shall be appointed is always a matter of discretion, to be exercised sparingly and with great caution in the case of quasi public corporations operating a public highway, and always with reference to the special circumstances of each case as it arises. All that we say in this connection is that, under the circumstances presented in this case, the appointment of the receiver was within the power of the court. The order appointing him and directing him to operate and manage the property was not a nullity.

But it is contended that the suit instituted by Sage was collusive and an imposition upon the court; that, as held by the Circuit Judge, when the receiver was discharged, after having served seventeen months, and the property was turned

over to the company the process of the court was not used " in good faith to collect complainant's judgment, but as a means of placing the property and business of a railroad company in the hands of the court, to be managed through a receiver, to the end that the defendant may not be subject to suits in the ordinary course of judicial proceedings, and in order to enable the plaintiff and defendant, by agreement between them, through the receiver, to apply all the earnings of the road during a series of years to the improvement and betterment of the property;" and that, consequently, the proceeding was not, in fact, an adversary one.    5 McCrary, 643; 647; 18 Fed. Rep. 571, 573.   Whether this characterization of that proceeding be just or not, it is not necessary in the present case, and in the view we take of it, to determine.  For if it be just, the court below applied the proper remedy for the abuse of its process, that is, it discharged the receiver and turned the property back to the possession and control of the company, which, in the view taken of the facts by the Circuit Judge, ought never to have been disturbed.  And the court proceeded, as was its duty, to dispose of the net earnings of the property, while under the management of its officer, acting under its directions.

But did the imposition, if any, practised upon the court, inducing it to appoint a receiver when one would not have been appointed had it been aware of the exact situation, add anything to the legal or equitable rights of the trustees in the mortgage executed by the railroad company?  Had the receiver never been appointed, and had the railroad company operated the property just as the receiver did, producing the same amount of net earnings that were in the hands of the receiver, at the time of his discharge, would the trustees in the mortgage of May 1, 1877, have been entitled to demand that such earnings be paid over to them?.  Clearly not.  "It is well settled," this court said in *Dow* v. *Memphis and Little Rock Railroad Co.*, 124 U. S. 652, 654, "that the mortgagor of a railroad, even though the mortgage covers income, cannot be required to account to the mortgagee for earnings, while the property remains in his possession, until a demand has

been made on him therefor, or for a surrender of the posses-
sion under the provisions of the mortgage.    That is the effect
of what was decided by this court in *Galveston Railroad* v.
*Cowdrey*, 11 Wall. 459, 483." See also *Gilman* v. *Ill. and
Miss. Tel. Co.*, 91 U. S. 603; *American Bridge Co.* v. *Heidel-
bach*, 94 U. S. 798; *Kountze* v. *Omaha Hotel Co.*, 107 U. S. 378;
*Teal* v. *Walker*, 111 U. S. 242, 250.

The trustees filed their bill of foreclosure June 26, 1883, but
they did not intervene as trustees in this suit until February
23, 1884, some time after the discharge of the receiver, and
after the property had been surrendered to the company.
Their claim and intervention shows upon its face that no part
of the interest accruing upon the bonds secured by their mort-
gage subsequent to January 1, 1882, had been paid at the time
they so intervened.   By the terms of that mortgage, it was
provided that, in case of continuous default by the railroad
company, for thirty days, after maturity, in paying any of
the sums specified in the interest coupons, the principal sums
in all the bonds "shall immediately become due and payable,"
and, thereupon, the trustees, upon the written request of the
holders of a majority of said bonds, "shall enter upon and
take possession of all and singular the charter, franchises, and
property hereby conveyed, and shall and may sell the same
to the highest bidder for cash in hand," etc.   There was no
moment pending the receivership when these trustees, upon
the request of the holders of a majority of the bonds, might
not have appeared in this suit, or in a separate suit in the
same court, and asked that the receiver hold for them as well
as Sage, or that he be discharged and they put in possession
of the mortgaged property, for the purposes of sale, pursuant
to the mortgage.   Neither they nor the bondholders elected to
pursue that course.   It may be that their action was dictated
in part by the fact, found by the master, that the railroad,
the principal security for their debts, was being largely
improved during the receivership out of the income of the
property, and that no part of that income was being diverted
to pay Sage's judgment or the debts of the company.   If the
trustees, pending the receivership, had intervened and asked

possession of the property, they might perhaps have been entitled, as against general creditors, to the income of the property thereafter accruing, upon the principles announced by this court in *Dow* v. *Memphis and Little Rock Railroad Co.* (as reorganized), 124 U. S. 652. But we do not perceive any legal ground upon which they are entitled to the net earnings of the property, while it was in the hands of the receiver, in a suit instituted by a judgment creditor for the protection of his own interests, and not of the interests of the trustees, or of the bondholders, or of other creditors. His suit was, in effect, an equitable levy for his benefit, upon the net income of the property. Other creditors, who filed their claims, based upon judgments, gain nothing, as between themselves and Sage, by the fact that their judgments were rendered upon coupons, which were secured by lien upon the mortgaged property. Neither they nor their trustees, prior to the termination of the receivership, chose to assert this lien. Nor did they, pending the receivership, ask that the receiver should, from and after their appearance, hold for them as well as for Sage. They took action as simple contract creditors, whose claims were reduced to judgment. If the bondholders, when intervening simply as judgment creditors, acquired an interest in the fund, they could not, upon any recognized principles of equity, deprive the creditor, at whose instance and for whose benefit the receiver was appointed, of his priority of right, arising from the institution of suit for the purpose of reaching the income of the debtor's property. The judgments at law obtained by bondholders upon their coupons were all rendered after the receiver took possession of the property; some in the spring of 1883, the larger part of them in October and November of that year, just before the receiver was discharged.

These conclusions are not affected by the fact that Sage, in his bill, alleges that he seeks relief, subject to all the rights and equities of the holders of bonds and of their trustees. It was only meant by this to give assurance that he had no purpose, in asking the relief he did, to affect injuriously their security, or the liens created in their behalf by the mortgages

referred to. Taking the allegations of his bill to be true, he sought only, by means of a receivership, to reach the net income of the railroad company in satisfaction of his debt.

But it was insisted in argument that the judgment which Sage obtained against the railroad company was fraudulent, in that the debt for which it was rendered was fictitious; that he never in fact owned a real note executed by that company, based upon any valuable consideration whatever. The record not containing the note or a copy of it, some question was also made, in argument, if we did not misunderstand counsel, whether any such note was ever in existence. We could not sustain these propositions without reaching the conclusion that there had been the most shocking perjury upon the part of witnesses in this cause; a conclusion which the evidence does not warrant. The judgment which Sage obtained by confession of the defendant company, in the Circuit Court of the United States, recites that it appeared to the court, "as well from the promissory notes with the complaint filed as from the said confession and consent, that the defendant is indebted to the plaintiff in the sum aforesaid," etc. The record shows that Sage, under date of June 20, 1882, addressed to the president of the Missouri Pacific Railway Company a communication, offering to give fifty cents on the dollar, payable in ninety days, for its debt and note " against the Memphis and Little Rock Railroad Company (as reorganized), amounting, as I am informed, to the sum of $115,479.03, your company guaranteeing that the said amount is justly due to it from the Memphis and Little Rock R. R. Co." The records of the former company recite that on motion of Mr. Dillon, seconded by Mr. Eckert, that offer was accepted, and that said debt and note " are hereby transferred and assigned to said Sage, and that the president be and he is hereby authorized to execute any further assignment of said debt that counsel may advise, and also to indorse and deliver said note to the said Sage." Sage swears in his deposition that he purchased, held, and brought suit upon said note. The treasurer of the Missouri Pacific Railway Company testifies that his company did, in June, 1882, hold the note of the Memphis and Little Rock Company

(as reorganized) for $115,479.03, given by the latter company for advances made by the Missouri Pacific Railway Company to meet coupons of the former company. It is true, that, independently of the evidence furnished by the note, it does not clearly appear that the advances made by the Missouri Pacific Railway Company to the other company aggregated the full amount of the note. But this deficiency in the proof is more than made good by the fact that the note was given and that the Memphis and Little Rock Railroad Company (as reorganized) confessed judgment for its amount, and does not now dispute the debt; although, by its appeal, it claims that the fund in court should be paid to it rather than applied to Sage's judgment.

It is contended that Sage does not show that he has ever paid to the Missouri Pacific Railway Company the amount he agreed to give for the note of the Memphis and Little Rock Railroad Company (as reorganized). Proof of that fact was not vital in the case. After the acceptance of his offer to purchase the note, and after it had been transferred by indorsement to him, he came under a legal obligation, which he recognizes, to pay what he agreed to pay. He cannot escape that obligation.

For the reasons stated we are of opinion that the decree below was erroneous in that it did not, in the order directing the distribution of the fund remaining in court, give a preference to the judgment at law obtained by the appellant Sage.

*The decree reversed and cause remanded, with directions for further proceedings consistent with this opinion.*