### SOUTHERN RY. CO. v. CARNEGIE STEEL CO., Limited.

(Circuit Court of Appeals, Fourth Circuit. November 10, 1896.)

#### No. 165.

1. RAILROAD COMPANIES—RECEIVERS—SUPPLY CLAIMS.
    Under the principles which govern the administration of the assets of a railroad operated by receivers, all debts for current supplies, contracted within a reasonable time before the receivership, should be paid from the

surplus earnings before any part can be spent on improvements, payment of interest or dividends, or any investment favorable to mortgage bondholders.

2. SAME—DIVERSION—EQUITY.

If any portion of such earnings have been diverted to such purposes, then, as against mortgage creditors, the supply creditors have a superior equity to have the earnings restored, from the proceeds of the mortgaged property for their benefit.

3. SAME—REASONABLE TIME.

No precise definition of "reasonable time" has been adopted, and regard must be had to the circumstances of each case. The fact that the receivers were appointed, not at the suit of a mortgagee, but at the instance of creditors and stockholders, to protect the property from disruption, and hold it together until a plan of reorganization could be adopted, is a circumstance favoring the equity of supply claimants. In such a case, *held*, that a claim for steel rails, furnished from 9 to 11 months prior to the receivership, was not lost by laches, it appearing that renewable notes were taken for the debt, which were accordingly renewed, and that claim was promptly made at their maturity. Bound v. Railway Co., 7 C. C. A. 322, 58 Fed. 473, and 8 U. S. App. 472, distinguished.

Morris, District Judge, dissenting as to the allowance of interest on the claim.

Appeal from the Circuit Court of the United States for the Eastern District of Virginia.

The Richmond & Danville Railroad Company was a corporation created by the laws of the state of Virginia. It became the owner of several other railroads, and the lessee of others, and it created and maintained a great system of railroads traversing several states. The main road, that of the Richmond & Danville, was successful in its management and prosperous to a degree; but the necessity of the system required that many portions of it, which were not productive, should be kept up, although operated at a loss. These were a drain upon, and wholly exhausted, the surplus received from the better portion of the system. The expenses attending the operation and preservation of the great system were enormous, and it became necessary to reorganize. To this end, a bill was filed by creditors and others, known in this case as "Clyde and Others v. Richmond & Danville Railroad Company." Previous to the filing of this bill, efforts had been made to formulate and adopt a plan of reorganization which would relieve the situation. But these having failed, and the discovery and adoption of a satisfactory plan of reorganization requiring considerable time, the aid of the court was sought by these creditors and stockholders, in order to give adequate protection to the corporation, from suits and otherwise, until a satisfactory financial reorganization could be effected. The bill was filed on the 15th day of June, 1892, and F. T. Huidekoper and Reuben Foster were appointed receivers. To this bill the mortgage creditors were not parties. The receivers administered the affairs of the system in their hands, from June 17, 1892, the date of their appointment, to July 31, 1893. They received from the corporation on their appointment $180,427.91 in cash, and collected from accounts due prior to their appointment $671,000. They received in gross earnings during this receivership $11,669,789.50. The operating expenses, including taxes, were $8,371,997.19. The net earnings were $3,297,792.31. Out of this they paid large sums for construction on the main road, the Richmond & Danville, and for construction work on leased and owned lines, and for equipment. They also paid expenses incurred prior to the receivership, judgments against parts of the system, on rentals, dividends, car trusts, and interest on mortgage bonds. On 17th day of July, 1893, the Central Trust Company, a mortgage creditor of the Richmond & Danville Railroad, filed its bill for foreclosure of mortgage, and under that bill Samuel Spencer, F. W. Huidekoper, and Reuben Foster were appointed receivers, and were put in possession of the property theretofore in charge of the former receivers, who were finally discharged July 31, 1893. On their discharge they turned over to their successors in cash $141,325.19.

The Carnegie Steel Company, Limited, appellees here, filed a claim against the Richmond & Danville Railroad Company in each of these cases. The claim was first filed October 14, 1892, with the special masters appointed in the first-named case. After the foreclosure suit was filed, this company, on February 12, 1894, upon its petition, was permitted to intervene in that suit, both suits being then consolidated; and on March 1, 1894, it filed another petition, setting forth at large its claim. The Carnegie Steel Company, Limited, holds five notes of the Richmond & Danville Railroad Company, dated as follows: March 21, 1892; March 24, 1892; April 4, 1892; May 16, 1892,—each payable in three months from their dates, respectively; and one dated June 7, 1892, at four months. The total principal is $125,067.39. The origin of these notes was as follows: On June 10, 1891, the Carnegie Steel Company made a contract with the railroad company to deliver certain steel rails on board cars at Bessemer, Pa., at $30 gross per ton, payable in notes at four months from date of shipment, without interest, with the privilege of renewal of such notes for three months, with interest on renewal at 5 per cent. per annum, and with the further privilege of a second renewal, with interest at 6 per cent. per annum. The rails were all delivered at intervals between 25th of July, 1891, and 10th of October, in the same year, and notes given therefor. The notes, according to contract, were renewed, and did not mature until after the appointment of the receivers in the Clyde case. The Carnegie Steel Company sought payment of its claim as having an equity superior to that of the mortgage debt, under the principles governing this court in the administration of assets in the hands of railroad receivers, and also as entitled to a preference under section 2485 of the Code of Virginia. The demand was made upon the purchaser, who, under the terms of the order of sale, is responsible therefor if the contention of the steel company is sustained. The circuit court sustained the claim, and gave the Carnegie Steel Company a decree for the principal sum thereof, with interest. Errors were assigned as to this action of the court, and the case has been heard on the assignments of error.

Henry Crawford and Willis B. Smith, for appellant.
N. P. Bond and B. H. Bristow, for appellee.

Before SIMONTON, Circuit Judge, and HUGHES and MORRIS, District Judges.

SIMONTON, Circuit Judge (after stating the facts). It is manifest that the two bills, that of Clyde and others, stockholders and creditors, and that of the Central Trust Company, a mortgage creditor, were intended to serve one purpose. Both looked to a satisfactory financial reorganization of the Richmond & Danville system. The first was filed to secure the protection of the court until such time as such financial reorganization could be perfected. The second was filed to carry out the financial reorganization which was then perfected. They can be treated as one proceeding, the one being the necessary consequence of and part of the other.

When the receivers were appointed in the second case, and were directed to take charge of the property theretofore in the hands of the receivers appointed in the first case, the court provided:

"Nothing in this order contained shall be construed to vacate any of the orders heretofore entered in the case of Wm. P. Clyde and others. But the court reserves full power to act upon the masters' reports filed in the said cause, and in said cause to adjudge and decree upon the rights of creditors asserting a claim against the property of the said railroad company, or income thereof, in preference to the mortgage debt thereof, by orders to be entered in the said suit of Wm. P. Clyde and others, upon notice to parties, with like effect upon the mortgage property and income as if the orders were entered in this cause."

When the Central Trust Company filed its bill, praying the appointment of receivers, it submitted its rights as mortgagee to these conditions. New England R. Co. v. Carnegie Steel Co., 75 Fed. 59.

Fosdick v. Schall, 99 U. S. 235, and the long line of cases following it, elucidating and applying the principles there first laid down, have established this doctrine: Railroad property is a matter of public concern. The franchises necessary to their creation and operation involve, in great extent, the rights and interests of the public, and these rights and interests must be preserved. To do this, the railroad must be kept a going concern. In order to construct a railroad, two parties must concur,—the capitalists, who put in the money and the work, and the sovereign power, which contributes the franchises, especially that of eminent domain. Without the money and without these franchises the road cannot be built. The consideration which moves the sovereign to grant these franchises is the public use of the road when built,—that it remain of use, that it be and remain a going concern. To this end, the first application of its earnings must be made. The stockholders subscribe, and the bondholders lend their money, with knowledge of this. Neither of them can get anything until the current expenses are paid. Upon this assurance, all persons who furnish labor or supplies to a railroad corporation are encouraged to give it credit, and to contribute to keep it a going concern. If, through inadvertence, or by intention, or from any other cause, any portion of the earnings has been applied to interest or dividends, or to the permanent improvement of or addition to the property, leaving unpaid debts incurred for things necessary to keep it a going concern, this is a diversion which the court, while aiding the mortgage creditor, will first correct. Fosdick v. Schall, 99 U. S. 235; Miltenberger v. Railway Co., 106 U. S. 286, 1 Sup. Ct. 140; Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675; Kneeland v. Machine Works, 140 U. S. 596, 11 Sup. Ct. 857; Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., 48 Fed. 188. And it makes no difference if the person furnishing supplies allows his claim to remain an open account, or prefers to close it with a note or acceptance giving extended credit; nor is it any waiver of the right to renew the paper at maturity. Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675.

The rule is stated by Waite, C. J., in Burnham v. Bowen, 111 U. S. 780, 781, 4 Sup. Ct. 675, 677:

"Every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income. Such being the case, when a court of chancery, in enforcing the rights of mortgage creditors, takes possession of a mortgaged railroad, and thus deprives the company of the power of receiving any further earnings, it ought to do what the company would have been bound to do if it had remained in possession; that is to say, pay out of what it receives from earnings all the debts which in equity and good conscience, considering the character of the business, are chargeable upon such earnings. In other words, what may properly be termed the 'debts of the income' should be paid from the income, before it is applied in any way to the use of the mortgagees. The business of a railroad should be treated by a court of equity under such circumstances as a 'going concern,' not to be embarrassed by any unnecessary interference with the relations of

those who are engaged in or affected by it. In the present case, as we have seen, the debt of Bowen was for current expenses, and payable out of current earnings. It does not appear from anything in the case that there was any other liability on account of current expenses unprovided for when the receiver took possession, and there is nothing whatever to indicate that this debt would not have been paid at maturity from the earnings if the court had not interfered at the instance of the trustees for the protection of the mortgage creditors."

If this be the law when a receiver is appointed at the instance of mortgagees, how much stronger is the equity when the receiver is appointed at the instance of stockholders, to secure uninterrupted opportunity for a satisfactory reorganization? The question is as to the application of those principles to the case at bar. There can be no question that the steel rails furnished by the Carnegie Steel Company come within the class of supplies necessary to keep the railroad company a going concern; and the evidence establishes the fact that, after incurring the debt, the railroad company was in the receipt of large earnings, which were applied to permanent improvements, rentals, and interest on the mortgage debt; that the receivers, who, under the Clyde bill, took possession of the property, earned large income, which was applied in the same way, leaving this debt unpaid; and that, when these receivers were discharged, they showed in their accounts a cash surplus, which was duly paid over to their successors under the Central Trust Company bill. The original contract of purchase of the rails was on June 10, 1891. Deliveries were made under it between July 25 and October 10, 1891. The price was represented by notes, with privilege of renewal. This privilege was exercised. Before the notes matured, the Clyde bill was filed, and receivers appointed. The notes fell due. The exact dates are these: The receivers were appointed June 15, 1892. The first note matured June 24, the second June 27, the third July 7, the fourth August 19, the last September 10, 1892. The supplies were furnished between July and October, 1891,—the first of them nearly eleven months, the last a few days more than nine months, before the appointment of receivers in the Clyde case. In the cases in the supreme court and on circuit in which this consideration for the claims of supply creditors is discussed, it is called an "equity." The only qualification in applying the equity when the facts call for its exercise is that the claim has arisen within a reasonable time before the receiver was appointed. No fixed definition of a reasonable time has been adopted.

In Thomas v. Railway Co., 36 Fed. 817, six months was made the limit of a reasonable time. In Miltenberger v. Railway Co., 106 U. S. 288, 1 Sup. Ct. 140, ninety days was the limit adopted. In Burnham v. Bowen, supra, the supplies were furnished some time in 1874 (when does not appear), and the receiver was appointed early in 1875. In Bound v. Railway Co., 8 U. S. App. 472, 7 C. C. A. 322, and 58 Fed. 473, eighteen months was considered too long a period. See, also, Railroad Co. v. Lamont, 32 U. S. App. 483, 16 C. C. A. 364, and 69 Fed. 23.

Mr. Justice Brewer, whose ability and large experience on this subject give his opinions great weight, in Blair v. Railway Co., 22 Fed. 474, says:

"The idea which underlies these principles I take to be this: That the management of a large business, like that of a railroad company, cannot be conducted on a cash basis. The temporary credit, in the nature of things, is indispensable. Its employés cannot be paid every month. It cannot settle with other roads its traffic balances at the close of every day. Time to adjust and settle these various matters is indispensable. Because, in the nature of things, this is so, such temporary credits must be taken as assented to by the mortgagees. * * * In this view, such temporary credits accruing prior to the appointment of the receiver must be recognized by the mortgagees, and such claims preferred. Now, for what time prior to the appointment of a receiver may these credits be sustained? There is no arbitrary time prescribed, and it should be only such reasonable time as, in the nature of things and in the ordinary course of business, would be sufficient to have such claim settled and paid. Six months is the longest time I have noticed as yet given. Ordinarily, I think that is ample. Perhaps, in some large concerns, with extensive lines of road and a complicated business, a longer time might be necessary."

It is evident that, in determining what is a reasonable time, regard must be had to the special circumstances of each particular case. No hard and fast rule can be adopted, nor any line of demarkation clearly made. "What is a reasonable time is a question of law depending upon the circumstances of the particular case." Paine v. Railroad Co., 118 U. S. 160, 6 Sup. Ct. 1019; Morgan v. U. S., 113 U. S. 477, 5 Sup. Ct. 588.

In the present case the Carnegie Company were dealing with the Richmond & Danville Company. This road controlled an enormous system of railroads, and was in the enjoyment of a very large revenue. There can be no doubt that, if the system had been continued, these rails could have been paid for out of the earnings. Demand for rails was constant; and it was to the highest interest of the railroad company to keep up its credit with the Carnegie Company. The system, however, had become too extended, and needed reorganization. Those interested in it as stockholders and owners attempted plans of reorganization, but did not get the unanimity necessary to perfect them. They sought the aid of the court, and asked its protection from creditors until such time as a scheme of reorganization could be completed and adopted. Their prayer was granted, and the receivers appointed. This whole action was for the advantage of those who owned or were interested in the property of the railroad company, for their advantage primarily and principally, if not for their advantage solely. But for this intervention in behalf of these stockholders and creditors, their taking the property out of the hands of the company, and sequestrating it for their own purposes, it must be presumed that the notes of the Carnegie Company would have been met at maturity. At the least, it can be said, in the language of Burnham v. Bowen, 111 U. S. 781, 4 Sup. Ct. 677, "There is nothing whatever to indicate that this debt would not have been paid at maturity from the earnings if the court had not interfered," at the instance of these stockholders. The mortgage creditor obtained the appointment of receivers in his bill on the express condition that the rights of creditors under the Clyde bill should be conserved. And, as that bill deprived the company of the power of receiving any further earnings, the court which appointed the receiver should require that to be done

which "the company would have been bound to do if it had remained in possession; that is to say, pay out of what is received from earnings all the debts which, in equity and good conscience, considering the character of the business, are chargeable on the earnings."

Has the Carnegie Steel Company lost its claim by laches? In the transaction with the railroad company, the rails were to be paid for with notes, maturing at no long date. This was for the advantage of the railroad company, distributing the payments, and making more easy the burden on the earnings. The paper was renewed according to the original contract of sale. This, as has been seen, is no waiver. Before the paper matured, the receivers took it out of the power of the company to meet the paper. As soon as it matured, the claim was made. The Carnegie Company did not sleep on its rights. It must be borne in mind that the Clyde bill was not the action of creditors of a corporation struggling to keep from bankruptcy, driven by creditors, after a long period of shaking credit. It was a plan adopted by the owners of the property to secure perfect reorganization, and avowedly to prevent creditors from disturbing inchoate plans to this end. The movement was conceived by the debtor company. They took their own time in applying to the court, and "the sudden action of the court left this debt unpaid." Bound v. Railway Co., 8 U. S. App. 472, 7 C. C. A. 322, and 58 Fed. 473. This case has been relied upon as settling a rule adverse to the claimant. In Bound v. Railway Co., the Lackawanna Company furnished steel rails, and took notes therefor, 18 months before the appointment of a receiver. These notes were payable out of earnings by the terms of the notes. Three months after the date of the notes, and five months before their maturity, interest on the second mortgage bonds of the railway company was paid. No other diversion of income was proved or appeared in the case. By taking the notes at 8 months, the Lackawanna Company was held to have assented to the use of the earnings during this period for payment of interest. This defeated their claim.

The question can be considered from another standpoint. There can be no question that, notwithstanding the terms of the mortgage, the mortgagee cannot require an account of the earnings, tolls, and income from the mortgagor, until he has made demand therefor or for a surrender of possession under the provisions of the mortgage. Sage v. Railroad Co., 125 U. S. 378, 8 Sup. Ct. 887, and cases quoted. When, therefore, the receivers appointed at the instance of stockholders and creditors took possession, they enjoyed the same right to the earnings and income which the railroad company enjoyed, and rightfully received them. As the railroad company would have been bound to use this income in the payment of the current expenses for labor and supplies, the receivers should have done so also. But, instead of this, receivers diverted the earnings, income, and funds in their hands towards the betterment of the property, permanent improvements and additions to it, and in payment of interest. And this was natural. They were appointed to take possession of the property, and to conserve it until a plan of reorganization could be adopted and perfected. To facilitate this plan, the

property must be kept up. To this end, the funds coming from earnings were used. When the purpose of the first receivership was accomplished, the mortgage creditors came in and reaped the benefit. Surely, those creditors whose claims were neglected, and from whom the earnings were diverted, have the right to ask and receive at the hands of the court the recognition and preservation of their claims. We see no error in the conclusion of the circuit court on this point. This renders unnecessary any discussion as to the force and effect of the Virginia statute. On that we express no opinion. The decree of that court is affirmed, with costs.

MORRIS, District Judge (concurring). If it be conceded that the claim of the Carnegie Steel Company has no statute lien superior to the mortgage of October 22, 1886, because the statute was passed after the date of the execution and recording of the mortgage, and that the debt, having been contracted more than six months before the appointment of the receivers, does not come within the rule which might permit it to be paid out of the proceeds of the corpus of the mortgaged railroad property, there still remains to be considered whether there is any other ground of equity which entitles the claim to payment out of any fund under the control of the court. If, after the appointment of the receivers under the creditors' bill, there came into their hands earnings which were expended for the betterment of the mortgaged property, instead of being applied to the payment of debts for current supplies, contracted within a reasonable time before the receivership, then, as against the mortgage bondholders so benefited, the supply creditor has an equity to have those earnings restored and applied to his debt.

In Burnham v. Bowen, 111 U. S. 782, 4 Sup. Ct. 675, 678, the supreme court said:

"We think the debt was a charge in equity on the continuing income, as well as that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership, and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in Fosdick v. Schall, 99 U. S. 252, the 'current debt fund,' as to make it proper to require the mortgagees to pay it back. But it is further insisted that even though the court did err in using the income of the receivership to pay the fixed prior charges on the mortgaged property, and thus increase the security of the bondholders, there is no power now to order a sale of the property in the hands of the trustees to pay back what had thus been diverted. In Fosdick v. Schall, Id. 254, it was said that if, in a decree of foreclosure, a sale is ordered to pay the mortgage debt, provision may be made for a restoration from the proceeds of sale of the fund which has been diverted, and this clearly because, in equity, the diversion created a charge on the property for whose benefit it had been made."

The facts of the present case suggest even a stronger equity in favor of the intervener than existed in the case of Burnham v. Bowen. The original bill filed by Clyde and others, who were creditors and stockholders, was professedly for the purpose of protecting the Richmond & Danville Railroad Company and its system, comprising 26 other railroads, in 6 different states, from disruption from the ef-

forts of creditors to enforce their debts. The court was asked to preserve its unity, and to prevent the ruinous sacrifice which would result from a severance of the system. The trustee of the foreclosed mortgage was not made a party, but within a few days after the filing of the bill the trustee was notified of applications for authority to use the income to pay maturing car-trust installments and rental obligations, and was represented by counsel, and did not object; and two months later the trustee was, on its own motion, made a party to the case. One year later, the trustee filed its bill to foreclose the mortgage of October 22, 1886, under which the sale was decreed. This mortgage covered, not only the Richmond & Danville Railroad proper, as to which it was a third mortgage, but also the interest of the Richmond & Danville Railroad Company in some 20 other railroad lines. These interests, consisting of leases, contracts for operating, and mortgage bonds, were part of the property sold under the decree of foreclosure. In the prayer for relief in the bill for foreclosure, the court is asked to appoint receivers, with power to operate the Richmond & Danville Railroad and "the railroads owned and leased or controlled by it, and with all such power as may be requisite to preserve said property until sale thereof." It is obvious that the preservation of the unity of the system of railroads which was operated by the Richmond & Danville Railroad Company, without any disruption of the system, was part of the relief prayed by the mortgagee's bill, as it had been by the original creditors' bill with which it was presently consolidated. How was the system to be preserved from disruption, and brought to a sale as a unit, except by using the current earnings of the receivers to pay the rentals and contract obligations necessary to prevent forfeitures of the leased and controlled railroads, and the payment of the prior fixed charges of the Richmond & Danville Railroad proper?

On the appointment of the Clyde receivers, June 16, 1892, there was paid over to them the cash then in the treasury of the corporation, amounting to $480,427.91; and they received sums earned prior to their appointment amounting to $671,363.40. These two sums, amounting to $1,151,791.31, very nearly paid all the current operating debts contracted within six months, which, by order of court, they were directed to pay. The deficit did not amount to as much as $100,000. From June 17, 1892, to July 31, 1893, at which latter date the Clyde receivers were discharged and the mortgagee's receivers took possession, the Clyde receivers had received:

| | |
|---|---|
| Gross earnings | $11,669,789 50 |
| Operating expenses, including taxes | 8,371,997 19 |
| Net earnings | $ 3,297,792 31 |

Out of this large sum they expended, under orders of court, about $500,000 for construction and equipment. They made car trusts payments amounting to over $200,000, and the remaining two and a half millions they paid away for interest, rentals, and dividends, including about $400,000 for interest on the two prior Richmond & Danville mortgages. These payments of interest, rentals, and divi-

dends on the roads operated by the Richmond & Danville Railroad Company were in very large part on those covered by the foreclosed mortgage, and were paid to prevent forfeitures and preserve the unity of the system. They were made upon orders of court, passed without objection, after notice to the trustee of the bondholders.

The Clyde receivers, when they were discharged, handed over to the new receivers appointed under the mortgagee's bill, in cash, $141,325.19, and supplies and materials purchased by them to a large amount. It is urged that there were no net earnings, because on the whole operation of the system there was a deficit; but the fact is that there was a gain of $346,163.10 from the operation of the Richmond & Danville Railroad proper, and the deficit resulted from the operation of other lines of the system which were covered by the mortgage, and which were held and operated by the receivers, and kept from forfeiture, primarily to preserve the security of the foreclosed mortgage. This was also the policy of the receivers appointed at the instance of the mortgagees, who operated the system from August 1, 1893, to July 1, 1894, pursuing precisely the same policy as the Clyde receivers. The Clyde bill was not a mortgagee's bill, but was filed by the stockholders and creditors, with the assent of the corporation, to preserve the system until its financial difficulties could be adjusted. When receivers are appointed under such a bill, it would seem to be peculiarly a case in which the court should use the income of the receivership in the way in which the corporation itself would have been bound to use it; that is to say, to pay current supply debts contracted within a reasonable time in preference to new construction and equipment expenses, and even in preference to expenditures to prevent forfeitures of subordinate lines. New England R. Co. v. Carnegie Steel Co., 75 Fed. 54; Scott v. Trust Co., 32 U. S. App. 468–480, 16 C. C. A. 358, 364, 69 Fed. 17–23.

The pleadings in both the Clyde case and the mortgagee's case, from the beginning to the end, disclose that the proceedings in court were in aid of the undertaking to adjust the complex financial burdens of the Richmond & Danville system, comprising over 3,000 miles of railroads. It further appears that the reorganization was effected through the sale under the foreclosed mortgage to the Southern Railway Company, and that, in the reorganization, the bondholders under the foreclosed mortgage were secured by a new mortgage on the whole system. It is a case, therefore, which does not suggest harsh treatment of the Richmond & Danville supply creditors in the interest of the bondholders of the foreclosed mortgage. This appeal does not raise the question of a supply creditor seeking to be paid out of the corpus of a mortgaged property, and who is compelled, before he is allowed to displace a prior recorded mortgage, to bring himself strictly within the limitations to that equity; but this is a supply creditor seeking to be paid out of the earnings which came to the receivers after his debt matured, and which were diverted by them, without opposition from the mortgagee, to expenditures which directly resulted in preserving the mortgaged property, which earnings, if the receivers had not been appointed,

there is no ground for supposing would not have been applied by the company to the payment of the supply creditors' debt.

The case of Bound v. Railway Co., 7 C. C. A. 322, 58 Fed. 473, was from the beginning a bondholders' foreclosure suit. There was no proof of earnings by the receiver diverted from supply creditors. It was an effort by an intervening supply creditor, who had furnished rails 18 months before the receiver was appointed, to obtain priority over the mortgage, and be paid out of the proceeds of a sale of the corpus of the railroad. The ruling in that case was that the claim was, in point of time, beyond the limit to which supply creditors who might claim to be paid in preference to mortgage bondholders must be restricted, and that, as to the diversion of earnings prior to the receivership, the creditor had waived it by his agreement, at the time of the purchase, to give credit and take notes, postponing payment of its claim beyond the due day of the mortgage interest paid.

In the present case we think that earnings of the receivers under the Clyde bill are shown to have been used for the benefit of the bondholders which should have been applied to the payment of the Carnegie Steel Company's supply claim, and that, under the terms of the decree of foreclosure, the purchaser was rightly required by the circuit court to pay the claim. But I do not think interest should be allowed. Thomas v. Car Co., 149 U. S. 95–116, 13 Sup. Ct. 824, 833. The delay has not been the fault of either the bondholders or the purchaser.