THOMAS *et al. v.* PEORIA & R. I. RY. Co. *et al.*, (WESTERN CAR Co.,
Intervenor.)

*(Circuit Court, N. D. Illinois. · August 29, 1888.)*

1. RAILROAD COMPANIES—BONDS AND MORTGAGES— FORECLOSURE—ACCOUNTING
—CAR RENTS—LEASES—PUBLIC POLICY.
    On foreclosure of the railroad mortgage in this case and the adjustment of
claims of intervening creditors, the contract of lease of cars to the mortgagor
company, by the car company dominated by the same persons, cannot be
made the basis of an accounting for the use of the leased cars.

2. SAME.
    But the lessor is entitled to such reasonable rent as could be obtained in the
open market for similar cars, to be used in the same manner.

3. SAME—RECEIVERSHIP—CHARGES ON INCOME—CAR RENTS.
    Where both before and during a receivership of the property of a railroad
corporation pending mortgage foreclosure, moneys from current receipts are
expended for improvements and equipment, a claim for rent of cars may be
charged on the income during the receivership, and, if that is inadequate,
upon the proceeds of the mortgaged property.

4. SAME—CLAIMS ACCRUING SIX MONTHS BEFORE RECEIVERSHIP.
    In the absence of special circumstances, the income during the receivership,
or the proceeds of the sale, will not be charged for rent of cars, claims for
loss of cars, etc., accruing more than six months before the receivership.

**5. SAME—REPAIRS OF LEASED CARS—WAIVER OF CLAIM.**

A claim by the lessor for the expense of repairs to the cars will not be allowed where no claim upon the receiver, pending the foreclosure, was made, but was first made in the amended petition of intervention by the lessor, filed three years after the cars were surrendered, and there is not sufficient evidence that the cars required repairs.

**6. SAME—RECEIVER'S CONTRACT.**

A claim in this case for repairs allowed, on the receiver's agreement to keep the cars in good repair for use on the road.

**7. SAME—INTEREST ON RENT.**

While a lease of the cars by the receiver is valid until disaffirmed by the court, it is not such "an instrument in writing" as entitles the lessor to interest under Rev. St. Ill. 1885, p. 1356.

**8. SAME—UNREASONABLE DELAY.**

Where the lessor steadily claimed a larger sum than was equitably due, and was refused payment of any amount approaching that to which it was entitled, there is such an "unreasonable and vexatious delay" as will justify the allowance of interest on the aggregate amount due, from the date of the filing of the master's report.

In Equity. On the claim of the Western Car Company, an intervening creditor in the foreclosure of a railroad mortgage.

The original cause, in which the Western Car Company became an intervenor, was a proceeding to foreclose a mortgage executed by the Peoria & Rock Island Railway Company to secure its first mortgage bonds to the amount of $1,500,000. The original bill was filed in October, 1874, and on February 1, 1875, J. R. Hilliard was appointed receiver of the railway company. He remained in control, and operated the railroad until after its sale under a final decree of foreclosure, passed January 11, 1877. At that sale R. R. Cabell became the purchaser. On the 17th of September, 1877, the sale was confirmed; the purchaser being allowed to pay into court, upon his bid, all the first mortgage bonds of the railway company held by him. On December 11, 1877, a further order was entered in the original cause, reciting, among other things, the assignment by Cabell to the Rock Island & Peoria Railway Company of his interest as purchaser, and ordering the master to execute and deliver to that company a deed of conveyance of the property so purchased, and the receiver to deliver to it possession. By said order it was further provided that Cabell should execute to certain sureties therein named a penal bond in the sum of $100,000, payable to the clerk of the court, for the use of whoever should be thereto entitled, and conditioned to pay into court such sum or sums of money as the court should thereafter direct. One of the purposes of that bond was to secure the payment of any sums that should be awarded in the cause to the Western Car Company. A bond in the amount named was executed as required. It should be stated in this connection that the decree of sale provided that the residue of the proceeds of the sale of the property, after paying certain specified costs and debts, should be applied under the direction of the court—*First*, to the payment of all remaining claims of intervening creditors, as they shall be allowed by the court; *second*, to the payment of the bonds and coupons secured by the mortgage, pay-

ing the same in full if the residue was sufficient for that purpose; otherwise, paying *pro rata* upon such bonds and coupons. The report made by the master, Henry W. Bishop, upon the claim of the Western Car Company is as follows:

"*To the Honorable, the Judges of said Court:* These intervening petitions allege that on March 1, 1872, the defendant company and the petitioner made a contract in writing, by which the car company leased to the defendant company ninety cars, seventy of them box cars, numbered from 151 to 220, inclusive, and twenty stock cars, numbered from 51 to 71, inclusive, for a term of five years, at a rental for each car of $20 per month, from the date of the delivery of said car; the contract also providing that, if any of them were disabled or destroyed, the company would immediately replace them with other cars of like quality and value, which should become the property of the car company, and also to maintain and keep said ninety cars, during the term of said contract and its renewals, in good repair and safe, and in proper running order, and at its own expense to furnish all the materials, and to make all the renewals of said cars from time to time, as they should be needed, and to put and keep them in proper condition for regular use, and, at the termination of said contract or renewals, to return said cars to the Western Car Company in proper condition and repair for their immediate and active use. That said company furnished said cars to said railway company about the date of said contract, and that the railway company received and used them, by reason of which they are entitled to the rent provided in said contract. That on October 1, 1873, another contract of a similar character was made between the parties, by which the petitioner rented to the defendant company 150 other cars, being fifty box-cars, numbered from 220 to 270, inclusive, and 100 White Line cars, numbered from 9401 to 9500, inclusive. That said second lease was also for the term of five years, and also provided for the payment of rent at $20 per month for each car, and with the same provisions in regard to the destroyed or disabled cars, keeping the cars in repair, and returning them in good repair, at the end of the lease. That the cars referred to were used by the defendant company until its road went into the hands of the receiver, appointed by the court, February 1, 1875. That the rental was, by stipulation of July 1, 1874, reduced to $15 per month, and continued until the receiver's appointment, leaving at that time a balance of $35,106.48. That two of said cars were destroyed, which were of the value of $1,500, and not replaced; and by an amended supplemental petition, filed October 16, 1877, it was claimed that there was due petitioner also the sum of $4,000 for repairs put upon 100 White Line cars. Interest is claimed upon said sums since the dates they were respectively payable by the terms of the contract. This is, in substance, the claim of petitioner prior to the appointment of the receiver.

"The petitions further allege that a contract in writing was made on the 11th day of June, 1875, between the petitioner and the receiver, by which the petitioner rented to said receiver 138 cars for the term of one year, with the privilege of renewal, at a rental of $10 per month for each car, keeping them in good repair for use on said road. That, under such contract, the receiver took possession of and used said cars until they were returned in bad order, with the exception of four, which were not returned at all; for the payment of which claim is made. That subsequently, in March, 1875, the receiver, with the consent of the petitioner, received 56 cars from the Chicago & Northwestern Railway Company, using the same at a rental per mile until December 1, 1875, when it is claimed, it was agreed between the parties that the use of the same should be retained by said receiver upon the same terms as provided in the contract last referred to, until the decision of the court in the

cause in which they had been replevied by the petitioner. That said receiver used the same, paying no rental therefor until rent had accrued to petitioner amounting to $15,281.34, together with the sum of $3,500, which, it was alleged, was the expense of putting them in good condition, besides the loss of rental or use during their repair. Interest is also claimed by said petitioner on each of said sums from the dates when payable by the terms of said contracts. These claims are therefore those which are alleged to have accrued prior to the six months immediately preceding the receivership, and those arrising during the six months before the appointment of the receiver and during the receivership; and statements of account, made out in detail, are exhibited in connection with the petitions, showing the way in which they have arisen, and the basis upon which the account is stated. It is insisted upon the part of the respondent that in stating this account the rental contracts upon which the petitioner bases that portion of its claim which accrued to it from the railway company prior to the receivership, should be disregarded, because fraudulent and void; the officers and persons controlling the railway company having been at the same time interested in, and having the management and control of, the car company; and that the compensation for the use of said cars during the entire period for which the fund or the receiver is liable should be determined by its fair value, as shown by the testimony. This question seems to me to be unimportant in view of what I understand to be the settled practice of the court in cases of this kind, which practice I have endeavored to follow in stating this account by allowing to the petitioners such payments as they are shown to be reasonably entitled to by the testimony.

" The defense interposed to all of the claims set out in the petition is of the the same general character, and I do not consider it nesessary to refer to it here more specifically. It has been the practice of the court in cases of this character to allow against the fund or the receiver claims of this kind, established by the testimony as reasonable and just, which have accrued during the period of six months prior to the appointment of the receiver, and during the receivership, independent of any contracts which may have previously existed, unless such contracts have in some way been recognized and adopted by the court; and in stating this account, I have endeavored to follow this practice. It is insisted upon the part of the petitioner that, as to a portion of the rental term, there was such a recognition by the court of the contract relation between the parties as would charge the respondent with the payment of rentals and repairs, as provided therein. I think the testimony does not justify this belief, and I am unable to find any order of the court authorizing the receiver to enter into any contract whatever for the rental of cars upon stipulated terms. In stating this account, I have ignored that portion of it which accrued before August 1, 1874, six months prior to the appointment of a receiver, at which time it was claimed that there was due and unpaid for rentals the sum of $32,400, upon the basis of the alleged contract price, or $26,162.99 after a credit of $6,237.01 for money received by petitioner for rent of the White Line cars. It is claimed by the petitioner that this sum should be applied on account of rentals due and accrued more than six months prior to the receivership. It appears, however, from the testimony, that this money was realized from the rental of the cars during the period of the three months immediately prior to the receivership, and I have therefore applied it as a credit in favor of the respondent on the account which accrued within the six months prior to the receivership. It is insisted, also, that upon the balance for rentals, as well as for repairs and renewals, interest should be credited at the rate of six per cent. per annum, and this has been done in every instance in the accounts presented by the petitioner. I have, however, disregarded this item, because I do not think it should be allowed against a receiver possessing no authority, except under the direction of the court, either to agree

upon the amount due from time to time, or to pay the same, except under its direction, or in a case where the amount in controversy is still undetermined, as in this instance.

"Upon the basis of what has already been stated, I find that for the period of six months prior to the receivership the respondents are liable for the rental of 240 cars at a stipulated price of $15 per month, being the months of August, September, October, November, and December, 1874, and January, 1875; amounting to $21,600. The payments which are shown to have been made upon this account amount to the sum of $13,300, leaving a balance of $8,300 due for the six months prior to the receivership. From the balance should be deducted the item of $6,237.01, earned by the White Line cars during the three months immediately preceding the receivership, and paid to the petitioner by the receiver, leaving due as the balance of claim for rental that accrued within six months preceding the appointment of a receiver, the sum of $2,062.99. The items which have been employed in making up this account are furnished in the statement of account between the petitioner and the railroad company, shown by Exhibit F to Whittredge's deposition, and also stated by counsel for petitioner in their argument; and from McKee's deposition in the demand which was made by the car company for payment of the sum claimed to be due, it appears there was included no charge for interest. The rental per month is also established by the testimony to have been a fair rental at that time. It is claimed by petitioner that there should be added to this sum due for the rental of these cars during the six months prior to the receivership the following items: Value of two lost cars, $850.00; sum expended in repairs of White Line cars, $4,003.86; and loss of rental during time of such repairs, $1,000.00. The testimony shows that prior to the receivership five cars were destroyed and lost; and four of these, I think, are shown to have been lost more than six months prior to the receivership. I therefore have rejected the claims of petitioner for lost cars. It appears from the evidence that the receiver, upon his appointment, returned the 100 White Line cars, after which there was expended by the petitioners upon them for repairs the sum of $4,003.86; and it is claimed that this expense is chargeable against the fund in court, as well as the sum of $1,000 for loss of rental during the making of these repairs. I have disallowed both of these claims, which makes the total amount due to petitioner, exclusive of interest, and after allowing all credits prior to February 1, 1875, when the receiver was appointed, the sum of $2,062.99. The claim of $4,003.86 for money expended in repairs on 100 White Line cars is involved in so much uncertainty by the testimony that I have found it exceedingly difficult to deal with it. The receiver swears that no claim was ever made upon him for repairs upon these cars, and there is no testimony offered upon the part of the petitioner controverting it, and there is very little evidence, if any, tending to show that their condition required repairs when the receiver delivered them over to the petitioner, in 1875. In the original petition, filed November 11, 1876, nearly two years after their surrender, and, according to the testimony of McKee, nearly a year after the repairs were made, no claim was made for the payment of this charge; neither was any claim made until the amended and supplemental petition was filed, October 16, 1877, which was nearly three years after the surrender of the cars. In view of these facts, and the effect of the testimony in respect to the condition of the cars at the time of their surrender, I am unable to determine what, if any, proportion of these repairs should be borne by the respondent, and am therefore obliged to disregard this item of charge as not having been established by the testimony.

"The other claim of petitioner is against the receivership, and for rentals which accrued after February 1, 1875, and for cash paid for repairs of cars which were returned damaged, and for lost cars, and for interest upon all the

overdue claims.    It appears from the testimony that, upon the appointment of the receiver, he returned the 100 White Line cars, and retained in his possession the remainder, claimed by the petitioner to have been 138 in number, but, as I find from the testimony, 135 only, although the auditor of the respondent treated the number as 138.    The testimony shows, I think, however, that the remaining five cars were in some way destroyed or lost; that through some arrangement the receiver used these cars during February and March, 1875, at a rental of $12 each per month, for which time payments were made at that rate, and at the rate of $10 per month each for April, 1875, which was also paid, with the understanding that he should pay a rental of $10 per car per month thereafter.    The statement of account which is produced by the petitioner adopts these rates of rental, giving the payments that were made upon account, and charging rental during the time of their repair.    A claim is also made for keeping these 135 cars in repair, and a statement of this is also exhibited in detail in connection with the petitioner's demand.

"The respondent denies that it is liable for the payment of these claims, because no engagement of that character was entered into between it and the petitioner, and, if liable at all, not to the extent demanded, for the reasons that the charges are in many instances excessive, having been unnecessarily incurred, and that a large number of the cars required were not received by it in good order.    It is insisted by the respondent that it was never required by the terms of its engagement to return these cars in any better condition than they were when he received them, and that any expenses that were incurred by the petitioner in putting them into condition for releasing are not properly chargeable against respondent; that the repairs put upon said cars were excessive, unnecessary, and not suited to the character of the cars, amounting practically to renewals, and adapted to a better use than was intended for them in their original construction.    I have found it difficult to deal with this branch of the case, for the reason that, while it appears that the bills which have been presented for these repairs were actually paid by the petitioner, it is also evident that in many instances these repairs were extravagantly conducted, and that in many respects they were rendered necessary by their condition before they came into the hands of the receiver; and there is much testimony in the case showing this to have been the fact.    It is also apparent from the testimony that in many cases cars were practically rebuilt and renewed.    Upon a very careful examination of all of the testimony bearing upon this branch of petitioner's claim, I find it impossible to separate the items of this account in such a way as to equitably charge this respondent with such portion of the repairs as he should be called upon to pay upon the basis of the claim of the petitioner, although in my estimation the effect of the testimony is to show that a credit, at least to some extent, of the amount charged by the petitioner upon this item, should be applied to the reduction of this claim.    A claim is also made for the value of four of the 138 cars which were never returned, amounting to $1,800, and credit afterwards given by the return of one of them.    I have already found that of the 138 cars but 135 went into the hands of the receiver, and I have therefore disregarded this claim.    In addition to this, it is claimed that the receiver came into the possession of fifty-six box cars, which had been replevied from the Chicago & Northwestern Railway Company, and which, by arrangement, were used by the receiver until they were finally surrendered.    For this use a mileage rent has been charged from March, 1875, to December 1, 1875, as appears by statement made by the auditor of the road, which rental, less certain conceded debits in the receiver's favor, amounts to the sum of $391.34; and that thereafter, from December 1, 1875, to the time they were finally surrendered, for their use and for the time they were detained for repairs a charge of $10 per month per car was made, amounting to the sum of $13,122.23.    For this last

term it is denied by the respondent that there was any written contract finally entered into. I think it is shown by the testimony that an arrangement of this character was agreed upon between the parties, and reduced to writing, though perhaps it was not finally consummated or delivered, and that, in any event, the cars were used during this time, and $10 per month per car was a reasonable compensation for their use. A claim is also made by the petitioner for $5,650 expended in repairing these fifty-six cars after their surrender to it by the receiver. It appears from the testimony that these cars were received in bad condition, after having been used for two or three years by the railroad, from which they appear to have been taken by the receiver, partly, at least, upon the suggestion and for the accomodation of the petitioner. It appears, however, that this sum was actually expended by the petitioner upon the cars; and, as I find it impossible from the testimony to determine to what extent the respondent is liable for the payment of these charges, I am unable to make what may be finally regarded as an equitable distribution of this liability, and am obliged to charge the respondent with the full amount of the payment shown to have been made on this account. Interest at the rate of six per cent. is charged upon all of the balances in these accounts, and credits have been given for moneys paid from time to time upon them.

"In estimating the amount due petitioner upon these claims, I have, as in case of the claim for the term prior to the receivership, not taken into account the interest demand, but have wholly disregarded it as to both branches of the account; and upon this basis I find and report that there is due and owing to the petitioner for the rent of 135 cars from February 1, 1875, to April 1, 1875, at a rental of $12 per month per car, which rental I find from the testimony to have been a reasonable rental at that time, the sum of $3,240.00. For the rent of 135 cars from April 1, 1875, to the date of their return at the rate of $10 per month, which I find from the testimony to have been a reasonable rental during this term, the sum of $35,375.97. I find that during this period there was paid out for repairing cars by petitioner the sum of $14,-046.55; and during both of these terms the payments made on account by the receiver was the sum of $29,808.00; leaving due petitioner the sum of $22,-854.52. I find also there is due a mileage rental for the fifty-six replevied cars, from March, 1875, to December 1, 1875, $391.34; and for rent of fifty-five of these cars from December 1st to the date of their surrender at the rate of $10 per month per car, which I find from the testimony to be a reasonable compensation for their use, the sum of $12,857.32. That there is due for money expended for the repairs of fifty-five cars the sum of $5,650.52; leaving due and owing petitioner upon this second branch of account against the receiver, the sum of $18,899.18; making a total due the petitioner for the term commencing with the appointment of the receiver, and extending over the entire term of the account with the receiver, the total sum of $41,753.70. I find the balance, therefore, due upon the claim of the petitioner for rentals and repairs and mileage, after deducting all credits, and the disallowance of interest, for the term beginning six months prior to the appointment of the receiver until the date of the surrender of the cars, respectively, the total sum of $43,816.69, for the payment of which I recommend that a decree be entered.

"Upon this reference I have been attended by the solicitors of the respective parties, and in the examination of the matters referred to me I have had the benefit of their full and careful presentation of the case. If, however, the court should be of the opinion that the respondent is liable for the rental of cars, on the terms of the rental contracts, that accrued and remained unpaid when the six months prior to the receivership began, and for the interest upon the balances stated during that time, and for the repairs claimed to have been made during that time, and for interest upon balances for repairs claimed

during that time, then there would be due and owing petitioner for rentals prior to the receivership."

*Hopkins & Hayward* and *John M. Butler*, for Western Car Company.
*Chas. M. Osborne* and *Saml. A. Lynde*, for the railroad company.

HARLAN, Justice.  The court cannot, consistently with any sound principle of equity or of public policy, recognize the contracts between the Western Car Company and the Peoria & Rock Island Railway Company, one dated March 1, 1872, and the other dated October 1, 1873, as the basis of accounting between the parties to this cause.  The officers and individuals dominating the car company were, substantially, the same officers and individuals that dominated the railroad company.  For every purpose of business the masters of the lessor company were also masters of the lessee company.  Those who contrived and directed the making of the leases in question in behalf of the car company must, under the circumstances disclosed by the record, be deemed to have contracted simply with themselves in reference to the monthly rental of its cars, and the terms upon which they were to be used by the railroad company.  When it is sought to use these leases as a means by which to reach the proceeds arising from the use and sale of the property of the lessee company, those who have an interest in such proceeds, as well as the corporation itself, are at liberty, for their own protection, to question their validity, or to insist that they shall not be made the basis of claims upon these proceeds.  It would be extraordinary if the holders of the mortgage bonds of the railroad company should be denied the right to show that the obligation imposed by these leases to replace such of the leased cars as were disabled or destroyed with others of like quality and value; to maintain and keep all of them.in good repair and in safe and proper running order; to furnish all the materials, and make all the renewals needed from time to time; to put and keep the cars in proper condition for regular use; and, at the termination of the lease, to return the cars to the lessor company "in proper condition and repair for immediate and active use,"—was, in effect, if not in fact, imposed upon the railroad company by those who, although holding stock in that corporation, were nevertheless interested, in behalf of the lessor company, in exacting the highest rentals for its cars, and in attaching to their use such conditions as were most favorable to it.  The court cannot close its eyes to the fact that those who assumed to bind the railroad company by these leases were directly interested in the profits to accrue therefrom to the lessor company.  The rule governing such transactions is not to be disregarded or enforced according as the court may happen to be able to ascertain the exact amount, in dollars and cents, which may be realized by an agent who undertakes to serve, in the same business, two principals, whose respective interests are antagonistic.  Such an agent cannot make a contract for both principals that a court is bound to enforce against the wishes of the objecting principal, or other parties in interest.  The present case is brought, by the evidence, within the principle announced in *Wardell* v. *Railroad. Co.*, 103 U. S. 658.  It was there said:

"The·directors of corporations cannot enter into or authorize contracts in behalf of those for whom they are appointed to act, and then personally participate in its benefits. Hence all arrangements by directors of a railroad company·to secure an·undue advantage to themselves at its expense, by the formation of a new company as auxiliary to the original one, with an understanding that they, or some of them, shall take stock in it, and then that valuable contracts shall be given to it, in the profits of which they, as stockholders in the new company, are to share, are so many unlawful devices to enrich themselves to the detriment of the stockholders and creditors of the original company, and will be condemned, whenever properly brought before the courts for consideration."

See, also, *Thomas* v. *Railroad Co.*, 109 U. S. 522, 3 Sup. Ct. Rep. 315; *Wright* v. *Railway Co.*, 117 U. S. 72, 94, 6 Sup. Ct. Rep. 697.

Practically, this is a suit by the Western Car Company upon a contract that it made, by its managers and controllers, not only for itself, but for the other contracting party, the railroad corporation. It is none the less so because those managers and controllers also had an interest in the lessee corporation. The leases referred to must therefore be put aside as a basis for ascertaining either the amount due the Western Car Company, or the nature of the obligations assumed by the railroad company or by the receiver on account of their having used the cars in question. But it does not follow that the railroad company and the receiver were entitled to use the property of the car company without making some compensation. While the leases of 1872 and 1873 cannot be made the basis of the accounting between the parties, the car company is nevertheless entitled to be reasonably compensated for the use of its cars; such compensation however, to be fixed without reference to, and wholly apart from, the leases. What is to be deemed such reasonable compensation? Or, rather, what are the elements in the inquiry as to reasonableness? On behalf of the railroad company and the bondholders it is contended, mainly upon the authority of *Thomas* v. *Railroad Co.*, that the true test is the value directly accruing to the railroad company from the use of the cars. If by this it is meant that the court must ascertain how much the railroad company in fact realized from the use of the cars, taking its whole business, so far as these cars were used, into account, that proposition cannot be sustained. The case cited hardly supports such a rule. All that was there said was that, in fixing the value of the labor and materials for which compensation was asked, the prices named in the contract there in question should not, in view of its illegality, govern the court; that compensation should not be given for labor and materials that were of no value whatever to the railroad company. If the labor and materials were of real value, that is, if they were needed or required by the business· or necessities of the company, then they were to be paid for; the amount to be ascertained in some mode consistent with law. Such I understand to be the extent to which the *Thomas Case* goes. The court did not mean, by anything there said, to exclude evidence as to what was usually allowed for such labor and·materials at that place, or in the locality where the labor was performed and the materials furnished. In the present case it is manifest that the railroad company actually needed

the cars furnished by the car company, and that they were of real value to it. Upon the question of reasonableness there is—and, in the nature of things, there must be—serious difficulty. The respondents call attention to the testimony relating to the stock dividends made by the car company, and insist upon such dividends as furnishing the proper test of rental value. But this test, while not to be disregarded altogether, is too uncertain, and would mislead; for the profits of the car company varied in different years. They also refer to the actual cost of each car, and upon that basis contend that the rent claimed by the car company is an exorbitant return for the capital at risk. This is a fair argument; but there are other considerations to be taken into account. The system of "mileage rates," as adopted between other railroad and car companies; the class of railroad companies among which that system should obtain; the rental paid, in open market, for similar cars furnished to other railroad companies by the Western Car Company, or by other car companies; the quality of the particular cars in question, as compared with cars made by other car companies,—these are all proper elements in the inquiry as to reasonableness of compensation. Recognizing it as impossible to lay down a rule that would be applicable in every case, it may be said, generally, that a fair compensation for the use of these cars during the several periods in question would be such amount as similar cars—to be used in the same manner, and upon similar roads —would commonly rent for in the open market. If the railroad company required the cars for ordinary or proper business purposes, as I think it did, it should be charged with such rental as, in the state of the market at the time, was fair and just under all the circumstances.

There are other matters of a general nature to which reference must be made before we come to consider the details of the accounting between the parties as set forth in the master's report. Under what circumstances, and to what extent, may the court charge the income of the railroad property in the hands of its receiver with the liabilities incurred by the railroad company, in respect to petitioner's cars, prior to the appointment of such receiver? Without stopping to discuss this question as if it were for the first time presented, it is sufficient to say that the following propositions are sustained by the decisions of the supreme court of the United States, viz.: (1) When "a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment, from the income during the receivership, of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable." (2) As it frequently happens, when a railroad company becomes pecuniarily embarrassed, that "debts for labor, supplies, equipment, and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided," and as in this way "the daily and monthly earnings, which ordinarily should

go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt," the presumption is that every railroad mortgagee, "in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income." Consequently "the income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements." (3) If anything is taken from the current debt fund, and put into that which belongs to the mortgage creditors, the court may require, as a condition of an order to take possession of the mortgage property, and hold the future income for the mortgagees, that "what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees;" this, notwithstanding the mortgage, may, in terms, give a lien upon the profits and income; for, "until possession of the mortgaged premises is actually taken, or something equivalent done, the whole earnings belong to the company, and are subject to its control." (4) So, also, if no order is made, when a receiver is appointed, that will, in terms, save the rights of creditors furnishing supplies, equipment, labor, etc., if it appear, in the progress of the cause, "that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made, out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business;" this "because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and, if they give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its hands as, if practicable, to restore the parties to their original equitable rights." (5) That "while ordinarily this power is confined to the appropriation of the income of the receivership, and the proceeds of mortgaged assets that have been taken from the company, cases may arise that will require the use of the proceeds of the sale of the mortgaged property in the same way;" as when, before the appointment of the receiver, or in the administration of the cause, income applicable to the payment of old debts for current expenses is taken and used "to make permanent improvements in the fixed property or to buy additional equipment." *Fosdick* v. *Schall,* 99 U. S. 235, 252–254; *Miltenberger* v. *Railway Co.,* 106 U. S. 286, 311, 312, 1 Sup. Ct. Rep. 140; *Trust Co.* v. *Souther,* 107 U. S. 591, 2 Sup. Ct. Rep. 295; *Trust Co.* v. *Railway Co.,* 117 U. S. 434, 457, 6 Sup. Ct. Rep. 809; *Burnham* v. *Bowen,* 111 U. S. 776, 4 Sup. Ct. Rep. 675; *Trust Co.* v. *Morrison,* 125 U. S. 591, 8 Sup. Ct. Rep. 1004; *Railroad Co.* v. *Cowdrey,* 11 Wall. 459; *Gilman* v. *Telegraph Co.,* 91 U. S. 603; *Bridge Co.* v. *Heidelbach,* 94 U. S. 798; *Sage* v. *Railroad Co.,* 125 U. S. 361, 8 Sup. Ct. Rep. 887; *Trust Co.* v.

*Shepherd*, 127 U. S. 494, 8 Sup. Ct. Rep. 1250. In *Miltenberger* v. *Railway Co.*, and, again in *Trust Co.* v. *Railroad Co.*, the court said that it could not be affirmed "that no items which accrued before the appointment of a receiver can be allowed in any case. Many circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay preexisting debts of certain classes, out of the earnings of the receivership, or even the *corpus* of the property, under the order of the court, with a priority of lien;" that while the discretion to do so should be exercised with great care, and while the payment of such debts stands *prima facie*, on a different basis from the payment of claims arising under the receivership, the former may be brought, by special circumstances, within the principle governing the allowance of the latter.

I come now to the examination of the accounts rendered by the car company for the use of its cars. The money out of which it seeks payment of its several demands being either the proceeds of the sale of the mortgaged property, or income derived from the property during the receivership, the petitioner's claims for use of cars, etc., accruing prior to the period of six months immediately preceding the appointment of the receiver, are passed by without any expression of opinion as to their correctness. The general rule that has obtained in this circuit for many years, though not fully or expressly formulated in any published decision, has been not to charge the income of mortgaged property accruing during a receivership, or the proceeds of the sale of such property with general debts for labor, supplies, and equipment, back of the six months immediately preceding the appointment of a receiver. While the court has not, perhaps, committed itself against applying a different and more liberal rule, when the special circumstances or equities of the case demand such a course, the general rule is as just stated; and I am unwilling in this case, and at this late day, to depart from it. Besides, I am of opinion that, under the circumstances that usually attend the administration of railroad property by the courts, through receivers, the rule stated is a wise and salutary one. It would not do to charge the income of mortgaged railroad property, managed by a receiver, or the property itself, with every debt incurred in all its previous history for labor, supplies, or equipment. As was said in *Fosdick* v. *Schall*, the business of all railroad companies is, to a greater or less extent, done on credit. Those who perform labor, or furnish supplies and equipment, usually expect and contract to be paid within a reasonable time; and they do not ordinarily perform labor, or furnish supplies or equipment, after the railroad company has failed to pay within such time for what has been previously done or furnished. Expenses incurred within such reasonable time constitute what are called "current expenses," which ought, if possible, to be paid out of the receipts during the same period. When, therefore, debts of that character remain unsettled, or are not put in suit, for such a time as would be deemed unreasonable, it may be fairly presumed that the creditors have ceased to look to current receipts for payment, and have accepted the position of general creditors who, as such,

would have no claim for indemnity upon any special part of the income. Upon these grounds, substantially, rests the rule that recognizes the right of the court to charge the income earned during the receivership with obligations for labor, supplies, and equipment, contracted by the railroad company during the six months immediately preceding the receivership. Such debts constitute operating expenses incurred to the end that mortgage bondholders might be protected, and that the company might be kept upon its feet, and subserve the public purpose for which it was established, namely, the maintenance of a highway for the convenience of the people. I will also say that the six-months rule which this court has heretofore recognized, when applied in cases arising since July 1, 1872, finds support, by analogy, in the statute of Illinois of that date, providing that fuel, ties, materials, supplies, or any other articles or things furnished to and necessary for the construction, maintenance, operation, or repair of a railroad, by contract with a railroad corporation, or work or labor performed for such construction, maintenance, or repair by like contract, shall be paid for as part of the current expenses of the road, and a lien to secure the same is given upon "all the property, real, personal, and mixed, of said railroad corporation, as against such railroad, and as against all mortgages or other liens which shall accrue after the commencement of the delivery of such articles, or the commencement of said work or labor: provided, suit shall be commenced within six months after such contractor or laborer shall have completed his contract with said railroad corporation, or after such labor shall have been performed or materials furnished." It may be added that the grounds upon which the court may charge the income of mortgaged railroad property, earned during the receivership, with debts for labor, supplies, and equipment received prior to the appointment of the receiver, are so fully stated in some of the cases cited—particularly in *Fosdick* v. *Schall*—that further discussion of them is unnecessary. But I will say that the six-months rule was observed by me at the circuit, when disposing of the case of *Trust Co.* v. *Railway Co.*, and the final decree, so far as it rested upon that rule, was not disturbed by the supreme court.

What, then, is the amount due the petitioner for the use of its cars during the six months immediately preceding the appointment of the receiver; that is, from August 1, 1874, to February 1, 1875? The master finds the respondents liable for the use, during that period, of 240 cars at $15 per month, in the sum of $21,600; that on this account there was paid $13,300, leaving a balance of $8,300. From the latter sum he deducts $6,237.01, earned by the White Line cars, and paid over to the car company, leaving a balance of $2,062.99. The deduction of the $6,237.01 was right, because that sum was earned by the White Line cars during the six months in question. But I am of opinion that the deduction of $13,300 is too large by $6,100. In estimating the payments on rental subsequent to August 1, 1874, and prior to February 1, 1875, the master included the following items in petitioner's account: August 11, 1874, $2,500; August 22, $3,600; September 22, $3,600; and Octo-

ber 2, $3,600. I am satisfied that the items of $2,500, August 11th, and $3,600, August 22d, aggregating $6,100, are for rent that accrued prior to August 1, 1874; consequently, instead of $13,300 being deducted from $21,600, only $7,200 should have been deducted; making a balance of $8,162.99, instead of $2,062.99, under this head. There is a further dispute between the parties upon this branch of the case; the petitioner contending that allowance should be made in its favor for these additional amounts: Value of two lost cars, $850; repairs of White Line cars, $4,003.86; loss of rental during the period of such repairs, $1,000. The item as to the two lost cars must be rejected because, according to the weight of the evidence, they were lost prior to the six months in question. The remaining items of $4,003.86 and $1,000 must also be rejected for the reasons, if there were no other, that have been assigned by the master. It results that the amount due the car company, independent of any question of interest, for the period of six months just preceding the receivership, is $8,162.99.

This brings us to the examination of the claims for the use of cars during the receivership. Upon the appointment of the receiver he retained the 100 White Line cars; but a dispute exists as to whether the number of other cars retained by him was 138 or 135. The master proceeds upon the theory that he received, and had in use, only 135 cars; five out of the original 240 cars, other than the White Line cars, having been "in some way destroyed or lost." The proof does show the loss of the two heretofore referred to, but it does not sufficiently appear that the others were destroyed. The remaining three may have been lost during the receivership. If so, the receiver was bound to account for them. Giving due weight to all the evidence, it must be held that the receiver retained and used 138 of the original 240 cars. The rent of 138 cars from February 1, 1875, to April 1, 1875, at $12 per month, a reasonable rental for that period, makes $3,312. I adopt that rental for the period stated, because it is reasonable, and because it is justified by the agreement between the car company and the receiver, under date of June 11, 1875, an agreement which was valid until disapproved by the court, and which, although not finally approved by the court, was so acted upon, with the knowledge of the parties, that neither side should now be permitted to question its validity. The rental from April 1, 1875, until the cars were returned, at $10 per month, the rate specified in the receiver's agreement, aggregates $36,163. These two sums, $3,312, and $36,163, make $39,475. From this last sum deduct the difference between the rent paid by the receiver, $29,808, and the amount paid out during the same period by the petitioner for repairs, $14,046.55, that is, $15,761.45, and there will remain on account of the rental of the cars from April 1, 1875, until they were returned, (excluding the replevied cars,) the sum of $23,713.55.

The next item to be considered relates to the rental of the 56 replevied cars. The master reports, upon the basis of mileage rental from March 1, 1875, to December 1, 1875, the sum of $391.34. That finding is approved. The main dispute here is as to the rental of the 56 cars from

and after December 1, 1875, until they were formally surrendered. He allows $10 per month, which makes an aggregate rental, after December 1, 1875, for these cars, of $12,857.32. Upon this branch of the case I have had great difficulty. The evidence is seriously, and, in some respects, painfully conflicting. But I perceive no reason to question the entire fidelity to truth upon the part of the witnesses. Looking at all the circumstances, I am of opinion that the indorsement by the receiver on the agreement of June 11, 1875, signed by him, that the 56 cars delivered to him, "being the cars replevied from the Chicago and Northwestern Railway Co.," shall be retained by him "upon the same terms set forth" in the above agreement, "commencing on the 1st day of December, 1875," should turn the scale. And as the terms of the agreement of June 11, 1875, were not unreasonable, and as the indorsement was one that the receiver might reasonably have made in the interest of a fair administration of the property in his hands, I approve the finding of $12,857.32 as the rental of the replevied cars while they were under the control of the receiver. The finding of $5,650.52 for repairs of the replevied cars, is also approved. The agreement of the receiver to keep those cars "in good repair for use on said road" justifies this allowance, if there were no other ground to sustain it.

It remains to consider the question of interest. The car company claims interest upon each item of its account for repairs, and each amount claimed as monthly rental for its cars. The demand for such interest is placed mainly upon the statute of Illinois, which provides that creditors shall be allowed to receive interest at 6 per centum per annum for all moneys after they become due on "any bond, bill, promissory note, or other instrument of writing," and "on money withheld by an unreasonable and vexatious delay of payment." Rev. St. Ill. 1845, p. 294; Id. 1874, p. 614; Id. 1881, p. 614; Id. 1885, p. 1356. In respect to interest on amounts due to the petitioner prior to the receiver's written agreement of June 11, 1875, the statute has no application; for, as already stated, the leases of 1872 and 1873 cannot be regarded valid instruments of writing, so as to be the basis of the accounting between the parties, or the foundation of a claim of interest under the local statute. Nor, assuming that statute to constitute a rule of decision in some cases for this court, do I think that the receiver's agreement of June 11, 1875, is such an instrument of writing as entitles the car company to claim interest as matter of absolute right under the statute. While that agreement or lease was valid as between the receiver and the car company until disaffirmed by the court that appointed the receiver, the car company would have had no legal ground of complaint, if the court had disapproved that agreement, and made such allowance for the use of the cars as was found to be just and reasonable, apart from the stipulations of the agreement. And while I have heretofore said that under all the circumstances of this case neither party ought to be heard to dispute the validity or terms of that agreement, it does not follow that it is a writing of the class described in the statute that has been cited. But I am of opinion that there has been, as to a portion at least of the period cov-

ered by this long litigation, a vexatious and unreasonable delay in the payment of what was justly due to the petitioner, and that some interest should be allowed. It is difficult to fix the precise date from which interest should equitably be calculated. On one side, it is apparent that the car company has steadily claimed a much larger amount than was, in good conscience, due to it, thereby justifying the respondents in making defense, from which occurred, necessarily, some delay. On the other side, it is equally apparent that the respondents have steadily refused payment of anything like the amount that the petitioner was, in good conscience, entitled to demand. Under all the circumstances of the case, I have concluded that it is right to allow the petitioner interest upon the aggregate amount due to it from June 22, 1885, the date of the filing of the master's report, until its claims are paid. I am of opinion that the following amounts should be allowed the petitioner, viz.:

(1) Balance for use of cars during the six months preceding receivership, - - - - - - - $ 8,162 99

(2) Balance of rent of 138 cars from February 1, '75, to April 1, '75, at $12 per month, and from and after the last date at $10 per month, - - - - - - 23,713 55

(3) Rent of replevied cars from March 1, '75 to December 1, '75, mileage basis, - - - - - - 391 34

(4) Rent of same from and after December 1, '75, - - 12,857 32

(5) Repairs of replevied cars, - - - - - 5,650 32

$50,775 52

Interest at 6 per cent. on this sum from June 22, 1885, the date of filing of master's report, to September 1, 1888, - - 9,985 80

$60,761 32

This amount, increased by such interest as shall accrue on the above sum of $50,775.52 after September 1, 1888, the petitioner is entitled to have paid out of the income of the mortgaged property earned during the receivership, and, if that be insufficient, out of the proceeds of the property itself. The stipulations between the parties, the letter of Hilliard, of date January 13, 1877, (which is admitted to be correct in its statements,) and the evidence in the cause showing the sums taken from current receipts that were applied, both before and during the receivership, for improvements, betterments, buildings, depots, machinery, and equipment, present a case that justifies the court, under the authorities cited, in charging the petitioner's claim upon the income of the property during the receivership, and, that being inadequate, upon the proceeds of the property itself. Counsel for the petitioner will prepare the proper decree, and, after submitting it to counsel for the respondents, will present it to the court for examination.