SPENCER et al. v. TAYLOR CREEK DITCH CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1912.)

No. 1,918.

1. CORPORATIONS (§ 566*)—INSOLVENCY AND RECEIVERS—PRIORITY OF CLAIMS—DISPLACEMENT OF MORTGAGES.

A court of equity has no authority to displace mortgage liens on the property of a private corporation, for which it has appointed a receiver, in favor of unsecured claims for labor or supplies furnished to the corporation after the execution of the mortgages, but nearly a year prior to the appointment of the receiver, and used in making improvements and repairs on its property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2283–2286; Dec. Dig. § 566.*]

2. RECEIVERS (§ 200*)—COMPENSATION—LIABILITY OF FUND—PROCEEDS OF MORTGAGED PROPERTY.

The refusal to allow compensation to a receiver and his counsel out of the proceeds of mortgaged property *held* justified under the facts shown,

where the receiver was not appointed at the instance of the mortgagee, and rendered no service to the mortgaged property.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 397–399, 401; Dec. Dig. § 200.*]

Appeal from the District Court of the United States for the Second Division of the District of Alaska.

Suit in equity by the Taylor Creek Ditch Company against the T. T. Lane Company, T. T. Lane, and the Northwestern Development Company, in which W. G. Spencer, Charles M. Sheafe, receiver of the T. T. Lane Company, and others, intervened. From a supplemental decree, interveners appeal. Affirmed.

This is an appeal from a supplemental decree of the District Court for the District of Alaska, Second Division, adjudging and decreeing that certain interveners in a suit for the foreclosure of two mortgages upon certain mining property in Alaska have no liens upon the mortgaged property superior to that of the mortgagee, and that the receiver of the property, appointed at the instance of the interveners and his counsel, have no right to their compensation as receiver and counsel for receiver, respectively, paid from the proceeds of sale realized upon the decree entered in the foreclosure· suit. The foreclosure suit was brought by the Taylor Creek Ditch Company, as the assignee and holder of two notes—one dated September 29, 1904, for $8,000, and the other, October 9, 1905, for $32,000; the first executed by one T. T. Lane to one N. B. Solner, and the second by the T. T. Lane Company to Anna G. Lane. The first note was secured by an instrument executed by T. T. Lane and de-. livered with the note to N. B. Solner, purporting to be a deed of certain mining property in Alaska, but the instrument was, in fact, a mortgage executed to secure the payment of the note. The note was payable on or before October 1, 1905. The second note was secured by a mortgage executed by the T. T. Lane Company, a corporation organized under the laws of the state of Nevada, to which T. T. Lane had transferred all the property described in the previous mentioned deed. The mortgage was delivered with the note to Anna G. Lane. It included the property described in the deed and other property, and secured the first note as well as other indebtedness and advances under the second note. The second note was payable on or before one year after date. The second mortgage, after describing the various properties conveyed, contained the following "after-acquired property clause": "And, also, all other water rights, titles and interests therein belonging to, or hereafter acquired by first party; and, also all and singular all the personal property now owned, or hereafter acquired by the party of the first part. Also, ·all the choses in action, rights in law and in equity, contracts and interests now owned or hereafter acquired by the said party of ‧the first part." The mortgaged premises included a large number of unpatented placer mining claims, water rights, and ditches, including ditches designated as the Henry creek and Coffee creek ditches, for the appropriation and diversion of running water for mining purposes, together with certain personal property. The T. T. Lane Company defaulted in the payment of its note, and foreclosure proceedings followed. In the meantime the Taylor Creek Ditch Company ‧had succeeded to the rights of the mortgagees in the property.

The foreclosure suit was commenced on June 22, 1907, by the Taylor Creek Ditch Company against T. T. Lane, the T. T. Lane Company, and the Northwestern Development Company, a subsequent mortgagee. Thereafter, and in a suit then pending in the same court wherein W. G. Spencer was plaintiff, and the T. T. Lane Company was defendant, Charles M. Sheafe was appointed receiver for the T. T. Lane Company. Prior to August 29, 1907, the receiver filed an answer to the foreclosure suit on behalf of the T. T. Lane Company, and on August 29, 1907, a stipulation was filed in the foreclosure suit signed by the attorneys for the respective parties and for the receiver, in which it was provided that the plaintiff might apply for, and procure to be rendered by the court, a decree of foreclosure of the mortgages set forth in the com-

plaint, and directing that said property be sold as provided by law, and that at least $25,000 of the proceeds of such sale, besides the cost of the sale, be paid to the United States marshal in a certified check, and that said marshal deposit said check in the registry of the court to await the court's application and distribution thereof by its supplemental decree; that the decree should in express terms reserve for subsequent determination and for adjudication by the court's supplemental decree all defenses, interventions, issues. and controversies set up by any answers or interventions filed therein previously to the entry of such decree of foreclosure, or thereafter and not less than one week prior to the time of the submission of such reserved matters to the determination of the court; that said decree of foreclosure should provide that the net proceeds of such sale should be paid into the registry of the court, and should be applied and distributed under and in conformity with the court's determination and adjudication of such reserved matters in and by such supplementary decree. It was further stipulated that an order be made extending the receivership of the property of the T. T. Lane Company as ordered in the suit wherein W. G. Spencer was plaintiff to the foreclosure suit, and directing that said receiver be joined as a party defendant, with leave to appear and answer the complaint; that the receiver's answer already filed in the name and on behalf of the T. T. Lane Company should stand as the answer of the receiver on behalf of the defendant company and its creditors generally and stockholders; and that the receiver have leave to file a complaint in intervention, setting up the claims of certain unsecured creditors of the T. T. Lane Company for labor performed, supplies, materials, and transportation furnished for and to the said T. T. Lane Company by said creditors subsequent to the making of the mortgages involved in the suit, for which equitable liens were claimed by such creditors paramount and prior to such mortgages. The stipulation further provided that the Taylor Creek Ditch Company and the Northwestern Development Company should reserve the right to contest the application of the receiver to be joined as a party defendant in the suit, and to answer or otherwise defend in said action, or file a complaint in intervention on behalf of the creditors of the T. T. Lane Company, and also to have the right to contest the right of any creditor or creditors of the T. T. Lane Company to appear and plead in said suit by intervention or otherwise. Pursuant to the stipulation, the foreclosure decree was entered on September 5, 1907, awarding judgment in favor of the plaintiff on its two mortgages in the total sum of $35,255.70, and ordering the mortgaged property to be sold to satisfy such judgment. The decree also contained the agreed reservations for supplemental decree, and on October 7, 1907, the mortgaged properties were sold under the decree, and purchased by the plaintiff as a whole for a lump sum, being the amount of the mortgage indebtedness, together with interest and costs. Of the proceeds of such sale $25,000 was placed in the registry of the court, subject to the disposition to be made of that sum by the supplemental decree. Subsequent to the decree the receiver filed a complaint in intervention, and W. G. Spencer and other creditors of the T. T. Lane Company filed also an amended complaint in intervention. The amended complaint in intervention represented claims. These claims for labor performed and supplies delivered in the season of 1906 may be classified as follows: (1) For labor and supplies for the construction of the Henry creek ditch, $16,214.36; (2) for labor for the repair and maintenance of Coffee and Arctic creek ditches, $1,747; (3) for labor performed in doing assessment work on sundry unnamed, unpatented mining claims, $1,828.50, making a total of $19,789.86.

The Taylor Creek Ditch Company demurred to the complaint, and, the demurrers being sustained by the court, the complainants elected to stand on the sufficiency of their respective complaints, and thereupon the supplementary decree was entered, from which the present appeal is prosecuted.

Thomas Shepard, for appellants.

Metson, Drew & Mackenzie and E. H. Ryan, for appellees.

Before ROSS and MORROW, Circuit Judges, and WOLVERTON, District Judge.

MORROW, Circuit Judge (after stating the facts as above). The first objection urged against the complaint in intervention is that while the allegations are reasonably full and explicit in alleging an enhancement in value of the Henry creek ditch, and the preservation of that particular water right by the indebtedness incurred for the labor and supplies used in its construction, there is nothing by way of allegation connecting that work with the mortgaged property as a whole, or indicating what, if any, mining claims were rendered more valuable thereby, or what, if any, of the other ditches or water rights covered by the mortgage were thereby improved, or how or to what extent, if at all, the other mortgaged property was conserved or preserved from deterioration or loss or forfeiture by such labor and supplies used in its construction.

This objection is based upon the fact that the mortgaged property included a number of water rights, ditches, and mining claims, and was sold as a whole, and that the money remaining in the registry of the court represents a part of the whole property, and not any specific part. It is objected, further, that it is not alleged in the complaint of intervention that the Arctic creek ditch, for the repair and maintenance of which labor claims were incorporated in the complaint, is one of the ditches and water rights covered by the mortgage; that there is no segregation of the labor performed on the Coffee creek ditch and labor performed on the Arctic creek ditch; that it is not alleged that the labor performed was necessary for the preservation of those ditches, or was for the benefit or enhancement in value or preservation of the remainder of the mortgaged property. It is further objected that it is not alleged on what particular claims of the more than 150 mining claims covered by the mortgage the assessment work was performed, or that such claims were covered by the mortgage, or that the work was necessary to preserve them from loss or forfeiture, or, if necessary, in what respect the preservation of these claims benefited, preserved, or enhanced the value of the remainder of the mortgaged property. We are of opinion that these objections are sufficient to sustain the demurrer to the complaint in intervention; but, as it may be possible to amend the complaint so as to avoid these objections, we will pass to consideration of other objections that go more directly to the merits of the case.

[1] Before considering these objections, a restatement of certain facts will more clearly present the questions to be determined. In September, 1904, one T. T. Lane executed a note to one L. B. Solner in the sum of $8,000. To secure the payment of this note, Lane executed and delivered to Solner a deed to certain mining property, including a large number of unpatented placer mining claims, together with water rights, ditches, and personal property. The deed was in fact a mortgage. The note was payable on or before October 1, 1905, but was not paid by that date. In the meantime Lane had transferred all of the mining property, ditches, and water rights described in the deed to the T. T. Lane Company, a corporation organized under the laws of the state of Nevada. On October 9, 1905, the T. T. Lane Company executed and delivered to Anna G. Lane a note for $32,000,

together with a mortgage to secure the payment of the same. The mortgage included the property described in the previous mentioned deed, together with all after-acquired titles and interests, personal property, water rights, choses in action, rights in law or in equity, contracts and interests, and secured the payment of the first note, as well as other indebtedness and advances to be made under the second note. The second note was payable on or before one year after date. The T. T. Lane Company defaulted in the payment of the note, and on June 22, 1907, the Taylor Creek Ditch Company, having succeeded to the interests of the mortgagees, filed its suit in foreclosure upon both mortgages. The parties to these transactions are all private individuals except the second mortgagor, which is a private corporation.

The complaint in intervention alleges that during the mining season of 1906 the T. T. Lane Company was engaged in constructing the Henry creek ditch and in maintaining and repairing the Coffee creek and Arctic creek ditches, and in doing assessment work on certain placer mining claims. For the labor employed and supplies and transportation used in this work the company incurred an indebtedness of $19,-789.86, which has not been paid. The claims constituting this indebtedness are the matters alleged in the amended complaint in intervention, and it is contended that these unpaid claims have a preferred right of payment over the mortgages in the distribution of the proceeds of the foreclosure sale.

The general rule is that a fixed legal right under a mortgage cannot be impaired by any equities subsequently arising. To this rule there are some exceptions, among others: (1) Claims for current operating expenses where railroads have defaulted in their obligations and receivers have been appointed. Pomeroy in his Equity Jurisprudence states the rule in such cases as follows:

"In cases of railroad receiverships, and perhaps in a few other special instances, priority is allowed to certain claims for operating expenses incurred within a reasonable time before the appointment of a receiver. The controlling principle appears to be that a railroad, having public duties to discharge, must be kept a going concern while in the hands of the court, and that to that end debts due its employés and other current debts incurred for its ordinary operations, which it is not usually practicable to pay in cash, and which are therefore payable on short terms, should be paid as they would have been paid if the court had not taken away from the corporation the control of the railroad. A cessation of the railroad's operations by failure to pay promptly the operatives or such other debts as railroads must necessarily incur for their ordinary, current operations must be prevented. Every railroad motgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. It is frequently stated that the right to preference depends upon a diversion to the use of the mortgagees of funds which should properly be applied to the payment of current expenses. It is not necessary, however, that the funds be used to pay the mortgage debt, principal, or interest. And it would seem that the better rule is that no diversion whatever need be shown. The practical reasons for the rule allowing preferences are as strong in both cases; for it is equally as important to keep the road a going concern where there has, or has not, been such diversion." Pomeroy's Equity Jurisprudence (3d Ed.) § 224.

It will not be necessary to follow the development of this doctrine of priority for current expenses in the operation of railroads as it has

been defined and limited in the Supreme Court of the United States commencing with Fosdick v. Schall (1878) 99 U. S. 235, 25 L. Ed. 339, and proceeding through numerous cases down to Gregg v. Metropolitan Trust Co. (1905) 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717. But in Wood v. Guarantee, etc., Co., 128 U. S. 416, 421, 9 Sup. Ct. 131, 32 L. Ed. 472, the court refers to the fact that the doctrine of Fosdick v. Schall had never yet been applied in any case except that of a railroad, and, as a reason for such a limitation, the court points out that the case lays great emphasis on the consideration that a railroad is a peculiar property of a public nature and discharging a great public work, and that there is a broad distinction between such a case and that of a private concern; and in Kneeland v. American Loan & Trust Co., 136 U. S. 89, 97, 10 Sup. Ct. 950, 953 (34 L. Ed. 379), the Supreme Court cautioned the lower federal courts against too great an extension of the doctrine, saying:

"The appointment of a receiver rests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. * * * No one is bound to sell to a railroad company or to work for it, and whoever has dealings with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

The objection that these observations of the court were not necessary to the determination of the cases in which they were made, and therefore not binding, ignores their general character and obvious soundness in dealing with alleged equities brought forward to supersede contract obligations and displace vested liens. The defaulting corporation in the present case is not a railroad corporation, and not even a public corporation under the laws of Alaska, nor are its operations of such a character that they may be considered analogous to the operations of a railroad or other public corporation.

The case of the Atlantic Trust Co. v. Woodbridge Canal & Irr. Co. (C. C.) 79 Fed. 39, 42, is cited among others as an exception to the rule limiting such priorities to railroad cases, but the claims allowed in that case were admitted to priority over the mortgage expressly upon the ground that, under the laws of the state of California, irrigation companies, like railroad companies, were quasi public corporations, and the claims in that case were accordingly limited to those incurred

for operation; that is to say, to those expenses required in keeping the irrigation works a going concern for the benefit of the public, while claims for construction as well as those for repairs and improvements were disallowed. The court referred to the law of the state that the use of water for irrigation was a public use, and, being a public use, it was as essential to the interest of the public that an irrigation company should be kept a going concern as that a railroad company should be kept a going concern. The use of water by the T. T. Lane Company was a private use, and the operations of its ditches were for the benefit of private property. The public had, therefore, no interest in keeping the corporation a going concern.

But, aside from the character of the corporation, if we turn to the claims themselves in the present case, we find that they do not measure up to the standard required of claims admitted to priority over mortgages in the case of defaulting railroads. They are not claims for current expenses; that is to say, for expenses which in the ordinary course of business would have been paid by the corporation out of the current income had not the court interfered and appointed a receiver of the property. In High on Receivers (4th Ed.) § 394h, the author states the law with respect to such claims as follows:

"Claims of general creditors of a railway company, which have been incurred prior to the receivership, and which do not fall within the class of current expenses for the ordinary operation and maintenance of the road, such as necessary labor, supplies, materials or equipment, and which do not, therefore, have any special equities entitling them to payment out of current income, will not be preferred out of the earnings of the receiver, or out of the proceeds of the foreclosure sale. The allowance of claims, which results in the displacement of the priority of mortgage liens, is to be regarded as the exception and not as the rule, and such claims will not be given a preference unless they may fairly and reasonably be regarded as debts incurred in the ordinary, daily operation and maintenance of the road. And where the expense is an extraordinary one, incurred outside the ordinary course of the business of the road, such as for original construction or reconstruction, or for extraordinary repairs, or for extensions or permanent improvements, the preference will not be granted."

Furthermore, stale claims are not allowed for expenses incurred prior to the appointment of a receiver. Such claims to be admitted to priority must have been incurred within a reasonable time before the receivership to be admitted as "current expenses." In Thomas v. Railway Co. (C. C.) 36 Fed. 818, 819, Mr. Justice Harlan, sitting in circuit, in 1888 stated a rule of limitation which has been observed by the courts ever since. He said:

"The general rule that has obtained in this circuit for many years, though not fully or expressly formulated in any published decision, has been not to charge the income of mortgaged property accruing during a receivership, or the proceeds of the sale of such property with general debts for labor, supplies, and equipment, back of the six months immediately preceding the appointment of a receiver. While the court has not, perhaps, committed itself against applying a different and more liberal rule, when the special circumstances or equities of the case demand such a course, the general rule is as just stated; and I am unwilling in this case, and at this late day, to depart from it. Besides, I am of the opinion that, under the circumstances that usually attend the administration of railroad property by the courts, through receivers, the rule stated is a wise and salutary one. It would not do to

charge the income of mortgaged railroad property, managed by a receiver, or the property itself, with every debt incurred. in all its previous history for labor, supplies, or equipment. As was said in Fosdick v. Schall, the business of all railroad companies is, to a greater or less extent, done on credit. Those who perform labor, or furnish supplies and equipment, usually expect and contract to be paid within a reasonable time; and they do not ordinarily perform labor, or furnish supplies or equipment, after the railroad company has failed to pay within such time for what has been previously done or furnished. Expenses incurred within such reasonable time constitute what are called 'current expenses,' which ought, if possible, to be paid out of the receipts during the same period. When, therefore, debts of that character remain unsettled, or are not put in suit, for such a time as would be deemed unreasonable, it may be fairly presumed that the creditors have ceased to look to current receipts for payment, and have accepted the position of general creditors who, as such would have no claim for indemnity upon any special part of the income."

In the present case the receiver was appointed by the court in the original action about July 1, 1907. The amended complaint in intervention in this case was filed October 31, 1908. The claims are for expenses incurred by the corporation in the mining season of 1906. The corporation must have been in default for more than a year with respect to many of these claims when the original action was commenced, and not less than nine months with respect to any of them. We are not aware of any case that would admit to priority claims of this character.

Another exception to the rule that a fixed legal right cannot be impaired by equities subsequently arising are the legal rights created by the lien laws in force at the time of the execution of the mortgage. These laws enter into and become a part of the contract. But in this case no such rights were acquired by the interveners. Their failure to do so is explained as follows in their complaint:

"These intervening complainants severally requested of the said T. T. Lane Company at sundry times and insistently during the autumn of the year 1906 the payment of the said indebtedness so due and owing to them, respectively, and in each instance they were assured by T. T. Lane (one of the defendants herein), then the president of said T. T. Lane Company, that if they would wait patiently and take no steps or proceedings to enforce their respective claims for said indebtedness, nor in any way embarrass said company in its affairs, said company could and would raise the necessary money to pay all of said indebtedness during the winter of 1906-07; and thereupon these intervening complainants and other persons similarly situated—all of whom were, respectively, entitled under the laws of the district of Alaska to statutory liens upon said ditch for the security of their claims upon filing claims or notices of such liens within sixty (60) days after they had respectively ceased to labor thereon or furnish supplies, etc., thereto—relying upon the assurances aforesaid, refrained from taking any steps or proceedings to enforce their several claims, or doing anything to embarrass said company and refrained from making or filing any claims or notices of said liens upon said ditches, etc., to which they were entitled as aforesaid, until said statutory period of sixty days within which said claims or notices of liens must be filed had expired, and, if these intervening complainants had not been deceived and misled by said assurances, they would have filed their respective claims and notices of such liens, and would have perfected their said liens, and the same would have thereupon become and constituted liens upon said ditches and said water rights, prior and paramount, to the lien of said mortgage."

It appears from this allegation that the complaining interveners relying upon the personal assurances of T. T. Lane, the president of

the T. T. Lane Company, that their claims would be paid waived the right to acquire a statutory lien that would have been prior and paramount to the lien of the mortgage, and now, having failed to realize upon the personal assurances of the president of the company, they seek an equally effective equitable lien on the property. We know of no rule that will give them such a remedy under the circumstances.

[2] It is contended, further, that the court erred in refusing compensation to the receiver and his counsel out of the funds in the registry of the court. It appears from the record that the receiver was not appointed at the instance, nor was the appointment in the interest of the mortgagee, and that he has rendered no service to the mortgaged property. It appears, further, that the receiver was allowed by the court for himself and his counsel compensation for the services rendered with respect to certain property that came into his hands; that this allowance was the entire proceeds of such property over and above the necessary expenses. We do not think, under the circumstances, the receiver or his counsel is entitled to any compensation out of the fund now in the registry of the court.

It follows from these considerations that the complaint in intervention did not state facts sufficient to entitle the interveners to a priority, and that neither the receiver or his counsel is entitled to compensation in these proceedings.

The supplemental decree of the court below will, therefore, be affirmed.